*In re* PAROLE OF HAEGER

Docket No. 297099. Submitted August 10, 2011, at Detroit. Decided
     November 1, 2011, at 9:05 a.m.

     The Alpena County Prosecutor applied in the Alpena Circuit Court
        for leave to appeal the Parole Board's grant of parole to Raymond
        H. Haeger, a prisoner under the jurisdiction of the Department of
        Corrections. The Parole Board intervened. After granting the
        prosecutor's application, the court, Michael G. Mack, J., initially
        remanded the matter to the board for an explanation of its decision
        pursuant to MCR 7.104(D)(7). On remand, the board affirmed its
        decision to grant parole, and the prosecutor renewed his applica-
        tion for leave to appeal. The court granted the application and
        reversed the board's decision pursuant to MCR 7.104(D)(8), ruling
        that the board had abused its discretion by granting parole despite
        the fact that Haeger's assessed probability for parole had declined
        since the board's previous considerations, which had resulted in
        denials of parole. The Court of Appeals denied Haeger leave to
        appeal, and the Supreme Court, in lieu of granting Haeger's
        application for leave to appeal, remanded the matter to the Court
        of Appeals for consideration as on leave granted. 488 Mich 1033
        (2011).

     The Court of Appeals *held*:

     1. The circuit court's decision to reverse the Parole Board's
        grant of parole did not violate the separation-of-powers doctrine.
        The circuit court did not order the board to deny Haeger parole;
        rather, it ruled that the board's decision was inconsistent with the
        objective factors outlined in the statutes and regulations and the
        facts on the record. This action was proper under MCR 7.104(D),
        which allows a circuit court to reverse or remand a parole decision
        if an appellant proves that the decision was in violation of the
        Michigan Constitution, a statute, an administrative rule, or cer-
        tain written agency regulations or was otherwise a clear abuse of
        discretion.

     2. The circuit court did not violate Haeger's right to due
        process by failing to provide him notice and an adequate opportu-
        nity to be heard in connection with the prosecutor's appeal of the
        Parole Board's decision. A prisoner enjoys no constitutional or

inherent right to be conditionally released from a validly imposed sentence. Further, although a parolee has a right to notice and the opportunity to be heard before parole is revoked, a potential parolee who remains in prison has no liberty for the Due Process Clause to protect. In any event, the record indicated that the prosecutor did properly notify Haeger of his intent to appeal the board's decision, that Haeger moved to dismiss the prosecutor's application for leave to appeal and filed two briefs in the circuit court supporting the board's decision, and that Haeger never requested a formal hearing.

3. The circuit court was correct to reverse the Parole Board's decision to grant Haeger parole, although it did so on the wrong basis. Absent a complete record and an updated psychological evaluation, it was impossible for the circuit court to have discerned whether the board committed a clear abuse of discretion in granting parole. However, the fact that the record was incomplete indicated that the Parole Board violated its duty to consider all relevant facts and circumstances in determining whether parole was in the best interests of society and public safety as required by Mich Admin Code, R 791.7715. Specifically, there were no case summary reports of Parole Board interviews, no indication that a transition accountability plan for Haeger had been developed pursuant to Rule 791.7715(2)(c)(iii), and no indication that he had received the psychological or psychiatric evaluation required for assaultive sexual offenders under Rule 791.7715(5)(b). The psychological evaluations Haeger received upon his incarceration in 1992 and in preparation for appeal in 1993 were of little relevance in determining whether his parole was in the best interests of society and public safety.

4. The board did not abuse its discretion by relying on a statement in a report that contained an internal inconsistency. It is not an abuse of discretion when a fact-finder faced with conflicting information makes a reasonable and principled decision regarding which side to believe. Moreover, the statement in question was supported by evidence elsewhere in the record. Further, the circuit court should not have disregarded the decision of the current Parole Board panel simply because it conflicted with the decisions of previous panels. It is not an abuse of discretion for two fact-finders to reach different conclusions from the complex and potentially conflicting information within a prisoner's record. Finally, the board did not give undue weight to the favorable aspects of the various scales used to assess Haeger's risk to the public; rather, it properly recognized that the circumstances of

Haeger's sentencing offense, which he could do nothing to change, consistently reduced his assessment scores.

5. The circuit court's decision to reverse the grant of parole was not fatal to Haeger's chances for parole. After a thorough review as required by the applicable statutes, regulations, and department policy directives, the Parole Board may use its discretion to either grant or deny parole to Haeger if it considers all the necessary information and adequately and accurately documents these steps in the record.

Affirmed.

PAROLE — CONSTITUTIONAL LAW — DUE PROCESS.

A prisoner enjoys no constitutional or inherent right to be conditionally released from a validly imposed sentence; although a parolee has a right to notice and the opportunity to be heard before parole is revoked, a potential parolee who remains in prison has no liberty for the Due Process Clause to protect.

Raymond H. Haeger *in propria persona.*

Before: MARKEY, P.J., and SAAD and GLEICHER, JJ.

GLEICHER, J. The Michigan Parole Board (the Board) granted Raymond Harold Haeger parole after he had served approximately 17 years of a 15- to 30-year sentence. The Alpena County Prosecutor objected to Haeger's release and sought leave in the circuit court to appeal the Board's parole decision. The circuit court ruled that the Board had abused its discretion by granting parole despite that Haeger's probability for parole had actually declined since the Board's last consideration. Accordingly, the circuit court reversed the Board's decision.[1]

We affirm the circuit court's reversal of the Board's decision but on different grounds. The Board failed to

---

[1] This Court originally denied Haeger's delayed application for leave to appeal, *People v Haeger*, unpublished order of the Court of Appeals, entered July 26, 2010 (Docket No. 297099), but the Supreme Court remanded for review as on leave granted, *People v Haeger*, 488 Mich 1033 (2011).

comply with certain regulatory provisions before reaching its parole decision. Specifically, Mich Admin Code, R 791.7715(5)(b) mandates that a prisoner with "a history of . . . [p]redatory or assaultive sexual offenses" undergo a "psychological or psychiatric evaluation before the release decision is made . . . ." There is no record indication that Haeger received such an evaluation after 1993. It is also unclear whether the Board considered Haeger's "[d]evelopment of a suitable and realistic parole plan," as required by Mich Admin Code, R 791.7715(2)(c)(iii), because Haeger's transition accountability plan (TAP) does not appear in the record. We are further concerned that Parole Board Member Charles Brown based his decision, in part, on Haeger's completion of additional sexual offender therapy (SOT) in 2009 despite that no documentation of that therapy exists in Haeger's file. In addition, "holes" in the record that the Board failed to remedy persist even after the circuit court ordered the Board to supplement Haeger's file. Because the Board violated its regulatory duty to defer its decision until Haeger received a psychological evaluation and its duty to consider Haeger's development of a parole plan, and because the Board's failure to adequately and timely comply with the circuit court's remand order resulted in an incomplete record, we affirm the circuit court's decision to reverse the Board's grant of parole to Haeger.

## I. THE PAROLE PROCESS IN MICHIGAN

The Parole Board, consisting of 10 members, is located within the Michigan Department of Corrections (DOC). MCL 791.231a(1). Prisoners come under the Board's jurisdiction after serving their minimum sentence, adjusted for any good time or disciplinary credits. MCL 791.233(1)(b) through (d); MCL 791.234(1)

through (5). For each potential parolee, a DOC staff member must evaluate the prisoner, ensure the completeness of the prisoner's file, and prepare a summary "Parole Eligibility Report" (PER) to advise the Board. See *In re Parole of Elias*, 294 Mich App 507, 511; 811 NW2d 541 (2011), citing DOC Policy Directive 06.05.103, p 1,[2] and MCL 791.235(7). Board staff members use this compiled information to score the prisoner's parole guidelines. DOC Policy Directive 06.05.100, ¶ D, p 1.

"Statutorily mandated parole guidelines form the backbone of the parole-decision process." *Elias*, 294 Mich App at 511. The guidelines " 'attempt to quantify' " various factors relevant to the parole decision in order " 'to inject more objectivity and uniformity into' " the parole process. *Id.*, quoting *In re Parole of Johnson*, 219 Mich App 595, 599; 556 NW2d 899 (1996). The Legislature directed the DOC to refine the statutory guidelines by developing more detailed regulations. MCL 791.233e(1). "Pursuant to this legislative mandate, the DOC promulgated regulations outlining certain factors for the Board to consider when making a parole decision[.]" *Elias*, 294 Mich App at 513. The Board must determine "whether parole is in the best interests of society and public safety" considering the prisoner's past and current criminal behavior, "[i]nstitutional adjustment," "[r]eadiness for release," "personal history and growth," and "physical and mental health." Mich Admin Code, R 791.7715(2). Moreover, when a prisoner has a history of "predatory or assaultive sexual offenses," the prisoner must undergo a "psychological or psychiatric evaluation before the release decision is made . . . ." Mich Admin Code, R 791.7715(5).

---

[2] DOC policy directives are available at <http://www.michigan.gov/corrections/0,1607,7-119-1441_44369--,00.html> (accessed September 8, 2011).

The DOC regulations further direct the Board to consider "all relevant facts and circumstances, including the prisoner's probability of parole as determined by the parole guidelines . . . ." Mich Admin Code, R 791.7715(1). The guidelines, in turn, require that scoring be based on the prisoner's time served as well as the "aggravating and mitigating circumstances" of the sentencing offense, the "prisoner's prior criminal record," the number of major misconducts committed by the prisoner within the preceding one- and five-year periods, the prisoner's score on "risk screening scales," the prisoner's age, the prisoner's performance in recommended institutional programs, and "[t]he prisoner's mental health" status. Mich Admin Code, R 791.7716(3).[3] The guideline factors are separated into eight sections, each with a list of subfactors to be scored and instructions on the point value to be assigned. *Elias*, 294 Mich App at 517, citing DOC Policy Directive 06.05.100, Attachment A, pp 1-9. The aggregated score is " 'used to fix a probability of parole determination for each individual on the basis of a guidelines schedule. Prisoners are categorized under the guidelines as having a high, average, or low probability of parole.' " *Elias*, 294 Mich App at 518, quoting *Johnson*, 219 Mich App at 599.

A prisoner being considered for parole may also undergo an informal and nonadversarial "interview conducted by one or more Board members assigned to the prisoner's panel." *Elias*, 294 Mich App at 518, citing DOC Policy Directive 06.05.104, ¶ R, p 4. Following the parole interview, a "Case Summary Report" is generally created for the Board's review.[4] See *Elias*, 294 Mich App at 519.

---

[3] The parole-guideline factors are quoted in full in *Elias*, 294 Mich App at 515-517.

[4] There are no case summary reports in the file submitted to this Court.

As described in *Elias*, the DOC recently implemented the Michigan Prisoner ReEntry Initiative (MPRI), which is "designed to promote public safety and reduce the likelihood of parolee recidivism" and to " 'improve[] decision making at critical decision points,' such as when the Board is considering whether to release a prisoner from incarceration on parole." *Id.*, quoting DOC Policy Directive 03.02.100, ¶ C p 1. Under the MPRI, the DOC and the Board are now required to prepare and consider additional reports, in particular the transition accountability plan TAP.[5] The TAP "succinctly describe[s] . . . exactly what is expected for offender success." *The MPRI Model: Policy Statements and Recommendations*, Michigan Prisoner ReEntry Initiative, January 2006, p 5.[6] A DOC staff member "must formulate a TAP with each prisoner, mostly to assist the prisoner's reentry into society, but also to assist the Board in rendering its parole decision." *Elias*, 294 Mich App at 519-520. The TAP analyzes the prisoner's risk factors, sets goals to decrease those risks, and establishes a plan for the prisoner to reach his or her goals. *Id.* Under the MPRI, the Board is also now required to conduct a "correctional offender management profiling for alternative sanctions" (COMPAS) evaluation. The COMPAS program

> is a comprehensive risk and needs assessment system, which takes into account both static information (such as the prisoner's past criminal offenses) and dynamic data (such as the prisoner's evolving attitudes and mental condition). . . .
>
> [A] case manager considers various characteristics of the offender and the offense and inputs scores into the

---

[5] As noted, there is no TAP in the file submitted to this Court.

[6] This document is available at <http://www.michigan.gov/documents/ THE_MPRI_MODEL_1005_140262_7.pdf> (accessed September 8, 2011).

> COMPAS computer software program. The software generates a score ranking the offender's statistical likelihood of violence, recidivism, success on parole, and other factors. [*Id.* at 520-521.]

Although "matters of parole lie solely within the broad discretion of the [Board]," *Jones v Dep't of Corrections*, 468 Mich 646, 652; 664 NW2d 717 (2003); see also *Hopkins v Parole Bd*, 237 Mich App 629, 637; 604 NW2d 686 (1999); MCL 791.234(11), that discretion is clearly restricted by legislative limitations. "In addition to creating the framework shaping the regulatory parole guidelines," *Elias*, 294 Mich App at 522, the Legislature dictates that " '[a] prisoner shall not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety,' " *Johnson*, 219 Mich App at 598, quoting MCL 791.233(1)(a). Moreover, "[o]nce the Board has rendered its decision, it must issue in writing 'a sufficient explanation for its decision' to allow 'meaningful appellate review,' *Glover v Parole Bd*, 460 Mich 511, 519, 523; 596 NW2d 598 (1999), and to inform the prisoner of 'specific recommendations for corrective action' if necessary 'to facilitate release,' MCL 791.235(12)." *Elias*, 294 Mich App at 522-523.

## II. PRIOR AND CURRENT PAROLE CONSIDERATIONS

With this framework in mind, we now consider the history of Haeger's imprisonment and the progression of his parole reviews. In 1992, Haeger pleaded *nolo contendere* to breaking and entering an occupied dwelling with the intent to commit a felony inside, MCL 750.110a(2)(b), and first-degree criminal sexual con-

duct committed during a felony, MCL 750.520b(1)(c). Haeger was sentenced to concurrent terms of 15 to 30 years' imprisonment for each offense. Haeger's convictions arose from the forcible rape of his cousin in the early morning hours of February 2, 1992. After consuming a large amount of alcohol at an Alpena bar, Haeger began driving toward his home in Hillman. At approximately 3:00 a.m., Haeger passed the home of his cousin and decided to stop. Haeger later told police that he had used a pair of his girlfriend's underwear to mask his face. He then entered his cousin's home by removing a basement window. Once inside, Haeger went into the kitchen and took a seven-inch knife from a drawer. Haeger made a noise, waking his cousin, who had fallen asleep on the couch in the adjacent living room. The victim entered the kitchen and found a masked man holding a knife crouched down next to the refrigerator. Haeger, armed with the knife, lunged at the victim and the two struggled. Ultimately, Haeger pinned the victim facedown on the ground and forcibly penetrated her vagina with his penis. When Haeger left, he threatened to return and kill the victim if she told anyone what had happened. The victim later told police that she recognized the voice of her assailant as belonging to Haeger. Haeger admitted to his parents in front of police officers that he had broken into the victim's home and raped her. The officers then transported Haeger to the Alpena Police Department, where he gave tape-recorded and written statements describing the offense in great detail.

Upon Haeger's imprisonment, the DOC referred him for a psychological evaluation. On October 6, 1992, the evaluating psychologist noted that Haeger "was polite and cooperative, admitting to guilt of instant offense." After conducting various diagnostic tests, the psychologist noted that Haeger's evaluation "reflects an imma-

ture, impulsive, alcohol abusive young male with a self-centered attitude" who "seems to have had a deep feeling of psychosexual inadequacy coupled with alcohol abuse that infringed on his judgment."

In preparation for Haeger's appeal of his convictions, appellate defense counsel procured another psychological evaluation of his client. On April 9, 1993, Dr. Michael Abramsky submitted a report opining that Haeger should have received a much shorter sentence for his offense. Abramsky described Haeger as "a rather shy, seclusive [sic] young man[.]" Haeger told Abramsky that he had "blacked out" and did not remember attacking his cousin. Haeger accused the police of feeding him the details of the crime. Abramsky completed a "Hare Psychopathy Check List," which "measures tendencies towards chronic criminality." From that test, Abramsky noted "a gross absence of psychopathic indicators." Specifically, Abramsky noted that Haeger "show[ed] no history of pathological lying . . . [or] of being callous or having a lack of empathy." Moreover, Haeger's "behavior has always been well controlled and there is no history of a loss of behavioral control." Based on the Hare evaluation, Abramsky believed Haeger had "a low probability" of recidivism and "chronic criminality."

Abramsky also evaluated Haeger under the Minnesota Multiphasic Personality Inventory (MMPI),[7] which Abramsky concluded did not show a patter[n] compatible with psychopathic deviance." Rather, Haeger's scores revealed an individual with "learning disabilities and attention deficit disorder." Abramsky administered

---

[7] The MMPI tests "configurations of personality traits in normal persons and . . . the personality patterns occurring in various types of mental illness." *Random House Dictionary of the English Language: Second Edition Unabridged* (1987).

a Rorschach test to measure Haeger's "more unconscious processes" and determined that Haeger did not appear unusually aggressive or preoccupied with sex.

Haeger was admitted into a sexual offender therapy (SOT) program in 2000. In order to be admitted into the program, Haeger had to "[a]ccept[] responsibility for his sex crime" and "[r]ecognize[] he has a problem and needs to change." Haeger was prematurely discharged from SOT on December 14, 2000, when he was transferred to a lower security facility. However, he completed the "Relapse Prevention" portion of the therapy. The treating psychologist indicated that Haeger's overall progress was rated 7 on a 10-point scale, indicating "good" performance. Haeger needed a score of 9 to be considered as having achieved the goals of therapy. Haeger scored 7 points for each of the following therapeutic goals:

a. Develop a clear understanding of his responsibility for setting up and committing his sex offense.

b. Examine his offense cycle, deviancy, thinking, beliefs, feelings, self-concept and behavior that led to his sexual offense.

c. Develop and demonstrate victim empathy.

d. To honestly self-disclose to the group about his deviant sexual behavior.

e. Examine his sexuality, morals, values, social and sexual relationship.

f. Develop a practical relapse prevention plan.

g. Learn self-control skills to shut down his deviant arousal pattern.

The treating psychologist concluded that Haeger "has made a positive effort to examine himself in a reflective manner. He has achieved a good understanding of his responsibility in the offense, offense cycle, victim em-

pathy, has self-disclosed, developed a plan to prevent relapse and seems better able to shut down deviant arousal pattern."

Haeger began working in the prison's food service department in 2001. Haeger's supervisors consistently gave him excellent reviews. Haeger was even commended for voluntarily transferring to a higher security, neighboring facility so he could continue to work while the lower security facility's kitchen was being remodeled.

Because of good-time credits, Haeger first became eligible for parole in 2004, after serving approximately 12 years of his original 15-year minimum sentence. In preparation for the Board's first parole review, a DOC staff member prepared a PER. Consistently with regulatory requirements, Haeger's 2004 PER noted that he had no major misconduct tickets, "interact[ed] well with staff and peers," and "present[ed] no management problems." The report further indicated that Haeger "received above average work evaluations" and was on a waiting list to attend a job-seeking-skills class. Haeger participated in Alcoholics Anonymous from 1992 through 1994 and completed a "Substance Abuse Phase II" program in 2002. The PER noted that Haeger had completed SOT on December 14, 2000. Overall, Haeger had "completed all . . . recommended programs" and "at least ⅔ of all program reports [were] above average."

Using Haeger's file and PER, the Board then calculated Haeger's parole guidelines score. Under the parole guidelines, a prisoner is assigned positive or negative points for variables in eight categories. These points are aggregated to reach a "Final Parole Guidelines Score" that determines whether a prisoner's probability of parole is high, average, or low. See DOC Policy Directive

06.05.100, Attachment A. At that time, Haeger received a final score of +6 points, placing him in the "high probability of parole" category.[8] The PER, parole guidelines, and Haeger's prison file were then sent to a three-member panel of the Board to render a parole decision. The Board determined that there were substantial and compelling reasons[9] to deviate from the parole guidelines and deny parole: "During interview [Haeger] failed to convince [the Board] that he has gained significant insight into the cause of his deviant behavior. [Haeger] stated that he was young and immature and unwilling to deal with stress and blew up." The Board recommended that Haeger continue to earn "positive work reports" and program reports as well as "good block or staff reports." The Board further recommended that Haeger "provide additional demonstration of positive prison behavior."

The Board again denied Haeger parole on July 13, 2005. Haeger continued to score +6 points on the parole guidelines, but the panel noted that Haeger "has not demonstrated enough insight into his crime, [Haeger] showed little or no empathy for the victim, which indicates that [Haeger] has not gain[ed]

---

[8] A score greater than +3 points corresponds to a high probability of parole, between –13 and +3 is an average probability, and less than –13 is low. See DOC Policy Directive 06.05.100, Attachment A, p 10. Haeger was assessed –1 point for each of his active sentence variables, which reflected his use of a weapon, "threat of force" or injury, "violence or cruelty beyond that necessary to commit" the offense, and commission of a sexual offense. Haeger was assessed +1 point on his prior criminal record variables, +8 points on his institutional conduct variables, and –5 points on his mental health variables, reflecting that he had committed a sexual assault stemming from a "compulsive, deviant, or psychotic mental state." See Mich Admin Code, R 791.7716(3)(g)(ii). Haeger received +1 point each for his age, statistical risk, and programming variables.

[9] See *Elias*, 294 Mich App at 522, citing MCL 791.233e(6) and Mich Admin Code, R 791.7716(5).

enough knowledge about his deviant behavior which was a brutal rape on his victim." The Board limited its recommended corrective actions to earning positive program reports and providing "additional demonstration of positive prison behavior."

On June 27, 2006, the Board denied Haeger parole a third time. Haeger's parole-guideline score had increased to +7 points because he was assigned an additional point for his age variable. Moreover, the PER prepared for the Board's review indicated that Haeger had an above average work record while imprisoned and received excellent reports from the cellblock guards. As its substantial and compelling reasons for denying parole, the panel noted the following: "[Haeger] minimizes his behavior based on his being drunk. This was a very d[e]liberate, planned rape. [Haeger] laid in hidding [sic]. Used a mask. The [victim] was his cousin. He presents a belief that his victim is fine and didn't suffer any injury. No insight or remorse." The Board recommended that Haeger "demonstrate responsible behavior by earning positive" program reports and "by avoiding" misconduct citations. The Board further recommended that Haeger participate in DOC-sanctioned activities, "enter into or continually involve [him]self in substance abuse programming," and "identify and develop community resources to address special needs identified through group therapy."

On June 21, 2008, the DOC conducted a COMPAS risk assessment of Haeger. That assessment indicated that Haeger was a low risk for violence, recidivism, and future substance abuse and could likely secure employment, maintain housing, and manage his finances once released. On the COMPAS Cognitive Behavioral/Psychological scale, Haeger scored 2 points, indicating that he was unlikely to "blam[e] others, mak[e] excuses or mini-

mize[e] the seriousness of [his] offense" and was also "unlikely to lead a high risk lifestyle or make impulsive decisions." However, the narrative statement accompanying this scale, which concludes that Haeger has a "likely criminal personality," was inconsistent with the assigned score. We now know that this inconsistency resulted from a computer software error. In its motion for reconsideration following the circuit court's reversal of the Board's 2009 grant of parole, the Board finally presented an affidavit from a DOC Department Specialist, Teresa Chandler. Chandler reviewed Haeger's COMPAS report and noted that the criminal personality scale is not a factor in considering the cognitive behavioral scale and was erroneously included on the report.

The Board denied parole a fourth time on August 4, 2008. The panel indicated, "In spite of the completion of recommended [SOT], [Haeger] lacks the necessary insight into his deviant behavior. [Haeger] is still considered a risk to the general public safety." At that time, the Board continued Haeger's sentence for a 24-month period before reconsidering parole. The Board again recommended that Haeger "demonstrate responsible behavior by earning positive" program reports and "good block or staff reports of conduct" and "by avoiding . . . misconduct citations." The Board also continued to recommend that Haeger "enter into or continually involve [him]self in substance abuse programming."

On November 5, 2008, Haeger committed his first and only major misconduct while imprisoned. Haeger pleaded guilty at an administrative hearing of possessing dangerous contraband. Specifically, guards found within Haeger's cell various metal objects, which Haeger claimed to use for "fix[ing] electronic devices." As a

result of this misconduct, Haeger was temporarily placed in a higher security level and forfeited 90 days of good-time credit.

On February 11, 2009, Haeger was evaluated under the Vermont Assessment of Sex Offender Risk (VASOR) scale.

> The [VASOR] is a risk assessment scale for adult male sex offenders age 18 and older. It was originally designed to assist probation and parole officers in making placement and supervision decisions. Because the VASOR does not provide a comprehensive survey of all factors relevant to sexual offending, it is best used as a decision aid along with professional judgement [sic] and other appropriate tools. Although reliability and validity studies are encouraging, it still should be considered an experimental instrument.
>
> \* \* \*
>
> The VASOR is composed of two scales, a 13-item reoffense risk scale and a 6-item violence scale. The reoffense risk scale is designed for assessing the likelihood of sexual recidivism. The violence scale is designed for assessing the nature of an individual's violence history and offense severity. The interaction of these variables, reoffense risk and violence, are considered important factors for determining an individual's overall risk level.
>
> \* \* \*
>
> The scoring process ideally should include an interview with the individual, in addition to carefully reviewing correctional case file information.
>
> Scores on the two VASOR scales are plotted on a scoring grid where their intersection falls into one of three risk categories; low, moderate, or high. These risk categories can be used to inform placement and supervision decisions. Offenders who score in the "low" range (i.e., low reoffense risk score and low violence score) are generally considered appropriate for community supervision and treatment.

Offenders who score in the "moderate" range may or may not be considered appropriate for community placement. Offenders who score in the "high" range (i.e., high reoffense risk score and/or high violence score) are generally considered inappropriate for community supervision and treatment. For public protection purposes, incarceration is generally recommended for offenders who score in the "high" range. [McGrath & Hoke, *Vermont Assessment of Sex Offender Risk Manual* (Research ed, 2001), p 1 (citations omitted).][10]

Notably, VASOR is "designed to be scored easily by probation and parole officers and correctional caseworkers." *Id.* at 2. A psychologist need not perform a prisoner's evaluation under this test.

On the VASOR reoffense-risk scale, Haeger received 10 points for the use of a potentially deadly weapon, 5 points for committing a sexual offense against an acquaintance, 5 points because his alcohol abuse had caused serious life disruptions and 3 points because his "drug" use had caused some legal and social problems.[11] With a total reoffense-risk score of 23 points, Haeger was considered a low risk for reoffense. On the "violence scale," Haeger received a score of 30 points for the use of a potentially deadly weapon during the commission of a sexual assault, 10 points for committing penile-vaginal penetration, and 10 points for causing injury not requiring formal medical treatment. With a total "violence score" of 50 points, Haeger was placed in the high "violence level." Considered together, Haeger was given a high overall risk classification on the VASOR assessment.

---

[10] This manual is available at <http://www.csom.org/pubs/VASOR.pdf> (accessed September 8, 2011).

[11] There is no indication in the record that Haeger ever abused any substance other than alcohol.

On April 6, 2009, the DOC prepared an updated PER for the Board's consideration, which included Haeger's 2008 major misconduct conviction. The PER indicated that Haeger's security level had been increased from Level I to Level II as a result. The PER described Haeger's work performance as adequate but no longer included a commentary on his performance. The PER noted that Haeger completed technical career counseling in 2008, substance abuse counseling in 2002, Alcoholics Anonymous in 1994, and SOT in 2000.

On April 21, 2009, the DOC prepared an "Offender Supervision Summary Report" and scored Haeger's parole guidelines. The summary report noted that Haeger posed a "middle to potential high" assaultive risk and a low risk for property crimes. The DOC scored Haeger's parole guidelines as a long-term offender. Haeger received a weighted score of –1 point for his active sentence variables and +1 point for prior criminal record variables. While Haeger had previously received favorable scores on the institutional conduct variables, his 2008 major misconduct reduced this section score to zero points. The DOC noted that Haeger's placement in the risk categories for assaultive and property crimes required a score of +1 point for the statistical risk variables. Haeger received a score of +2 points on the age scale, reflecting that Haeger was less likely to engage in further criminal activity given his more mature age. Haeger had received at least one adequate report and no inadequate reports from recommended prison programs, which also equated with a score of +2 points. Because Haeger had committed a sexual assault, he was given –5 points under the mental-health variables. Because of his recent major misconduct, Haeger's overall parole-guideline score was reduced to zero points, placing him, for the first time, in the "average probability of parole" category.

On June 26, 2009, two members of the Board panel voted to grant Haeger parole, citing Haeger's acceptance of responsibility for his past offenses, "satisfactory block reports," adequate involvement in work assignments, completion of vocational counseling, completion of substance abuse programming, and maintenance of family and community support while in prison. The Board noted, however, that Haeger's parole was "contingent upon the successful completion of MPRI InReach Phase."

We presume that the Board's reference to the "In-Reach Phase" means completion of "in-reach programming [provided] to prisoners eligible for parole." DOC Policy Directive 03.02.101, ¶ A. In order to receive "in-reach programming," a prisoner must be transferred to a facility that provides such services. *Id.*, ¶ E. Haeger is currently housed in the Cooper Street Correctional Facility and was previously housed in the Pugsley and Ryan Correctional Facilities, which are all designated MPRI "in-reach facilities." *Id.*, Attachment A. The record does not identify the type of services provided to Haeger. However, a September 30, 2009 "referral" indicates that Haeger had completed "programming."

### III. CIRCUIT COURT REVIEW OF THE PAROLE BOARD'S DECISION

The Alpena County Prosecutor appealed the Board's grant of parole in the circuit court. The circuit court initially determined that the Board had not provided sufficient information regarding its decision to grant parole and, therefore, the court was unable to adequately review the Board's decision. On September 1, 2009, the court remanded the matter to the Board "for reconsideration and, if necessary, a more complete explanation of why it is convinced Mr. Haeger 'will not

become a menace to society or to the public safety.' "
The Board contends that it reconsidered the grant of
parole and simply reaffirmed its decision. Accordingly,
the Board issued a new decision ordering Haeger's
release on parole. The Board did not provide any
additional support for its decision at that time.

The prosecution renewed its application for leave to
appeal, noting the lack of positive record evidence since
the 2008 parole denial. On January 25, 2010, the Board
finally provided the court with affidavits from the panel
members explaining their decision to grant parole to
Haeger. Charles Brown stated that he interviewed Haeger
in May 2009, and he felt that "Haeger demonstrated
insight, empathy, and responsibility for the crime he was
involved in." Haeger admitted to Brown "that he raped
his cousin after breaking into her home" and indicated
that he "wanted to show [he] was a man." Brown further
stated that "Haeger made it clear that he had learned his
triggers by attending [SOT], and was blunt, honest, and
candid about what he did, including acknowledgement
that he had threatened to kill the victim." Brown indi-
cated that he reviewed the COMPAS and VASOR assess-
ments, which described Haeger as a low risk to sexually
reoffend. Brown noted that Haeger "was also required to
attend additional [SOT] before parole was finalized. He
completed this program successfully on September 30,
2009."[12] Brown acknowledged that Haeger had commit-
ted a major misconduct in 2008. Ultimately, Brown
argued that Haeger would be paroled with many special
conditions in addition to the standard protocol and,
after considering the seriousness of Haeger's offense,
Brown determined that Haeger had "made a positive
change."

---

[12] Nothing in the record supports this assertion.

Miguel Berrios stated that he reviewed the reports from all DOC-recommended programs and specifically noted that Haeger had completed SOT with positive reports. Berrios also reviewed the COMPAS and VASOR assessments, which showed Haeger to be a low risk for sexually reoffending. Berrios described Haeger's general institutional conduct as good with the exception of the 2008 misconduct. Berrios indicated that he had not personally interviewed Haeger, but had reviewed the information from the interview with Brown. Berrios felt that Haeger had lowered his chances of reoffending and being a risk to society and had "made good progress toward re-entering society."

Ultimately, the circuit court reversed the Board's decision to grant parole to Haeger. The court provided the following justification for its decision:

> [A]s noted by the Parole Board in its brief, "[t]he common theme for the denials appears to be the member's [sic] belief that the prisoner failed to show proper insight concerning his crime." Indeed, in spite of somewhat favorable evaluations used by the [DOC], this was typically the overriding factor in the Parole Board's decision not to grant parole. Their denials repeated, over and over, his lack of "significant insight into the cause of his deviant behavior" and rationalization that he had been "young and immature . . . and blew up"; he "showed little or no empathy for the victim"; "minimizes his behavior based on his being drunk" and went so far as to suggest that the victim "is fine and didn't suffer any injury," reflecting an absence of "insight or remorse"; and generally "lacks the necessary insight into his deviant behavior." Yet even as Mr. Haeger's major contraband violation reduced his probability of parole from "high" to "average," the Parole Board suddenly changes its mind, on the basis of no reasons in the record, and decides that Mr. Haeger's past history of deflecting responsibility for his actions is cured and that he now accepts responsibility for his behavior.

To the extent that there are any reasons in the record at all since Mr. Haeger was most recently denied parole, they tend not to reflect well on Mr. Haeger. A COMPAS evaluation of Mr. Haeger, dated June 6, 2008, is generally positive but eviscerates its own credibility with the total disconnect between its evaluation of his Behavioral/Psychological condition ("likely absence of blaming others, making excuses or minimizing the seriousness of the offense . . . unlikely to lead a high risk lifestyle or make impulsive decisions") and the accompanying "statement," which says that Mr. Haeger has "a likely criminal personality which may include impulsivity, risk-taking, restlessness/boredom, absence of guilt (callousness), selfishness and narcissism, interpersonal dominance, anger and hostility, and a tendency to exploit others." Additionally, Mr. Haeger was scored on the VASOR system, dated February 11, 2009, which graded him at a "high" risk level. Yet, with only these evaluations of Mr. Haeger as further developments of his parole eligibility, the Parole Board departed from four prior denials of parole (including its own timeline, which had scheduled a 24-month interim before reconsidering Mr. Haeger's parole status) to suddenly grant him parole.

To be sure, Mr. Haeger has filed an extremely well-argued brief in defense of being granted parole, and the Court does not wish to trivialize his efforts at that or rehabilitation. The issue here, however, is the acceptability of the Parole Board's actions. While Mr. Haeger may or may not have come to accept his own responsibility for what happened in 1992, there is no evidence in the *record* that he has. The Parole Board has consistently denied him parole on this basis, and then suddenly decides he has satisfied their standards, without any evidence of gradual improvement or the other gradations in their observations of his behavior that would be consistent with such a change of heart. Indeed, to the extent that there is anything in the record that would induce the Parole Board to change its mind, it is the extremely troubling COMPAS evaluation and the unflattering VASOR score. Ignoring these tests, or cherry-picking only the most favorable elements of them in order to rationalize what the Parole Board had previously considered to be overwhelming evi-

dence against granting parole, is an arbitrary act which abuses the discretion vested in the Parole Board to make principled decisions. [Citations omitted.]

Following the court's decision, the Board and Haeger both moved for reconsideration. At that time, the Board finally supplied the court with Teresa Chandler's affidavit regarding the computer software error on Haeger's COMPAS report. The court denied the motions for reconsideration and, as a result, Haeger remains in prison.

## IV. STANDARD OF REVIEW

Judicial review of the Board's decision to grant parole is limited to the abuse-of-discretion standard. *Wayne Co Prosecutor v Parole Bd*, 210 Mich App 148, 153; 532 NW2d 899 (1995). Either the prosecutor or the victim of an offense may appeal in the circuit court when the Board grants a prisoner parole. MCL 791.234(11); *Morales v Parole Bd*, 260 Mich App 29, 35; 676 NW2d 221 (2003). Under MCR 7.104(D)(5) the challenging party has the burden to show either that the Board's decision was "a clear abuse of discretion" or was "in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation." An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Importantly, a reviewing court may not substitute its judgment for that of the Board. *Morales*, 260 Mich App at 48. [*Elias*, 294 Mich App at 538-539.]

## V. HAEGER'S CONSTITUTIONAL CHALLENGES LACK MERIT

Haeger contends that the circuit court ordered the Board to deny him parole and thereby violated the separation-of-powers doctrine. We disagree with Haeger's interpretation of the court's order.

MCR 7.104(D)(8) governs the conduct of the Board after a circuit court "reverse[s] or remand[s]" a parole decision as follows:

If a decision of the parole board is reversed or remanded, the board shall review the matter and take action consistent with the circuit court's decision within 28 days. If the circuit court order requires the board to undertake further review of the file or to reevaluate its prior decision, the board shall provide the parties with an opportunity to be heard.

This Court extensively described the separation of powers between the judiciary and the Board, which is an arm of the executive branch, and the interplay of the court rule in *Hopkins*, 237 Mich App at 642:

MCR 7.104(D)(8) contemplates that a Parole Board decision whether to grant parole may be reversed or the matter may be remanded. In reversing a Parole Board decision, the circuit court simply undoes it; to "reverse" means

"[t]o overthrow, vacate, set aside, make void, annul, repeal, or revoke; as, to reverse a judgment, sentence or decree of a lower court by an appellate court, or to change to the contrary or to a former condition. To reverse a judgment means to overthrow it by contrary decision, make it void, undo or annul it for error." [Black's Law Dictionary.]

In remanding a decision to the Parole Board, the circuit court does not specifically overrule it, but simply returns it to the Parole Board for some further consideration or activity. To "remand" is

"[t]o send back. The act of an appellate court when it sends a case back to the trial court and orders the trial court to conduct limited new hearings or an entirely new trial, or to take some other further action." [*Id.*]

Consistently with the definitions of "reverse" and "remand," *Hopkins* held that MCR 7.104(D)(5)[13] allows the circuit court to

---

[13] MCR 7.104(D)(5) states:

The burden shall be on the appellant to prove that the decision of the parole board was

review the Parole Board's decision to ensure that the board complied with the constitution, the statutory provisions, and applicable administrative rules, and, if so, that the board did not otherwise commit a clear abuse of discretion. As MCR 7.104(D)(8) contemplates, the court may reverse the Parole Board's decision or order further action consistent with the applicable constitutional, statutory, and administrative provisions. While the court may order that the Parole Board conform its conduct to the applicable provisions, no applicable provision authorizes the court to order that the Parole Board release a prisoner on parole. [*Hopkins*, 237 Mich App at 645-646.]

In this case, the circuit court did not order the Board to deny Haeger parole. Rather, the court held that the Board's decision was inconsistent with the objective factors outlined in the statutes and regulations and the record facts. The circuit court declined to simply "remand" the decision to the Board under MCR 7.105(D)(7), which provides:

On timely motion by a party, or on the court's own motion, the court may remand the matter to the parole board for an explanation of its decision. The parole board shall hear and decide the matter within 28 days of the date of the order, unless the board determines that an adjournment is necessary to obtain evidence or that there is other good cause for an adjournment.

The court had already remanded pursuant to subrule (D)(7) on September 1, 2009, and the Board failed to adequately explain its decision. Accordingly, the court proceeded under subrule (D)(8) and reversed the Board's decision. The Board must now "review the

(a) in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation that is exempted from promulgation pursuant to MCL 24.207, or

(b) a clear abuse of discretion.

matter and take action consistent with the circuit court's decision," MCR 7.104(D)(8), by "conform[ing] its conduct" to "the applicable constitutional, statutory, and administrative provisions," *Hopkins*, 237 Mich App at 646.

We also reject Haeger's contention that he was denied due process of law because the circuit court deprived him of his right to parole without providing an adequate opportunity to be heard.[14] Haeger argues that once the Board decides to grant parole, the prisoner has a vested liberty interest, regardless of whether the prisoner remains in prison pending release. Haeger further contends that he was unable to respond to the prosecutor's application for leave to appeal in the circuit court and that the court was required to conduct a hearing rather than decide the issue on the briefs.

Haeger's argument is fatally flawed. "A prisoner enjoys no constitutional or inherent right to be conditionally released from a validly imposed sentence." *Jones*, 468 Mich at 651; see also *Morales*, 260 Mich App at 48, and *Greenholtz v Inmates of Nebraska Penal & Correctional Complex*, 442 US 1, 7; 99 S Ct 2100; 60 L Ed 2d 668 (1979). If parole is granted and the prisoner is actually released from prison on parolee status, that parolee gains an interest in continued liberty. Although the parolee is still under the supervision of the DOC, he or she "can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Morrissey v Brewer*, 408 US 471, 482; 92 S Ct 2593; 33 L Ed 2d 484 (1972).

---

[14] In the circuit court, Haeger asserted that his right to due process had been violated by the prosecutor's failure to notify him of his right to respond to the application for leave as required by MCR 7.104(D)(2)(c)(iii)(A). However, the prosecutor did notify Haeger of his rights on the required form on August 1, 2009.

Therefore, when a parolee commits a parole violation leading to revocation of his parole, the parolee has a due-process right to "notice and the opportunity to be heard." *Jones*, 468 Mich at 652.

However, a potential parolee who remains in prison has no liberty to protect. As noted by the United States Supreme Court, "parole *release* and parole *revocation* are quite different. There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz*, 442 US at 9. A prisoner awaiting release on parole remains "confined and thus subject to all of the necessary restraints that inhere in a prison." *Id.* The "mere hope that the benefit" of parole "will be obtained" is too general and uncertain and, therefore, "is not protected by due process." *Id.* at 11.

In any event, Haeger received notice and had an opportunity to be heard before the circuit court reviewed the prosecutor's application for leave to appeal the Board's decision. The prosecutor notified Haeger of his intent to appeal the Board's decision. Haeger then moved to dismiss the prosecutor's application for leave to appeal on September 11, 2009. The circuit court granted the prosecutor's application on November 3, 2009, and scheduled a hearing for November 25, 2009. Once the circuit court granted the application for leave to appeal, Haeger filed two separate briefs supporting the Board's decision to grant him parole. The circuit court ultimately canceled the November 25 hearing and proceeded on the briefs alone as no party had requested argument pursuant to MCR 7.101(K), which states that, in an appeal to the circuit court, "[a] party who has filed a timely brief is entitled to oral argument by writing 'ORAL ARGUMENT REQUESTED' in bold-face type on the title page of the party's brief." Haeger

never objected to the court's order and failed to raise this complaint in his motion for reconsideration filed after the circuit court's opinion. We will not fault the circuit court for failing to provide an aggrieved party with a formal hearing when that party never requested one.

## VI. THE PAROLE BOARD DID NOT CONFORM ITS CONDUCT TO THE STATUTES AND REGULATIONS

Although we disagree with the reasoning employed by the circuit court, we agree with its decision to reverse the Board's grant of parole to Haeger. MCR 7.105(D)(5)(a) provides that a prosecutor appealing a Board decision has the burden to show that the decision was entered "in violation of . . . a statute, an administrative rule, or a written agency regulation . . . ." From the record before this Court, it appears that the Board violated its duty to "consider[] all relevant facts and circumstances," Mich Admin Code, R 791.7715(1), "in determining whether parole is in the best interests of society and public safety," Mich Admin Code, R 791.7715(2).

Mich Admin Code, R 791.7715(2)(c)(iii) provides that the Board may consider a prisoner's "readiness for release" as evinced by his or her "[d]evelopment of a suitable and realistic parole plan." Since as early as 2005, the DOC has used TAPs to assist prisoners in reaching this goal. According to an October 2005 DOC report, all state correctional facilities were scheduled to be involved in the MPRI model by September 2007.[15] And as noted, the development of TAPs is "the lynch-

---

[15] *The MPRI Statewide Implementation Plan: A Three-Step Approach,* October 2005, available at <http://www.michigan.gov/documents/ 3-_Statewide_Implementation_Plan_140266__7.pdf> (accessed September 8, 2011).

pin" of the MPRI model.[16] In the 2008 appropriations act for the DOC, 2008 PA 245, § 403(8), the Legislature made the DOC's 2009 appropriation contingent on the imposition of a TAP requirement, stating that the DOC "shall ensure that each prisoner develops a [TAP] at intake in order to successfully reenter the community after release from prison. Each prisoner's [TAP] shall be reviewed at least once each year to assure adequate progress." Although the DOC did not formally require that TAPs be prepared with potential parolees until March 2010,[17] it is apparent that these reports were already in widespread use by then. However, it appears from the record before us that the DOC did not develop a TAP with Haeger to outline his transition into society.

More importantly, the Board violated the mandate of Mich Admin Code, R 791.7715(5) by making its parole decision in the absence of evidence that Haeger had participated in a psychological or psychiatric evaluation. The regulation provides that a prisoner with a history of predatory or assaultive sexual offenses must undergo such an evaluation before the Board may render a parole decision. Mich Admin Code, R 791.7715(5)(b). Haeger underwent psychological evaluations in 1992, when he entered the prison system, and in 1993, in preparation for appealing his convictions and sentences. Nothing in the record indicates that Haeger has been psychologically evaluated in the last 18 years. The information in the historical evaluations is of

---

[16] *The MPRI Model: Statements and Recommendations*, p 5.

[17] DOC Policy Directive 03.02.101, ¶ I, p 2, provides, in relation to a prisoner receiving MPRI in-reach services, that a TAP "shall be developed or updated for the prisoner, as appropriate, to identify programming and other tasks and activities that the prisoner is expected to complete in order to reduce his/her identified risks, including any specifically identified by the Parole and Commutation Board."

little relevance in determining "whether parole is in the best interests of society and public safety" as Rule 791.7715(2) requires.

Similarly, Parole Board Member Brown indicated in his affidavit that Haeger completed additional SOT in 2009 while receiving in-reach services. However, we have located no record description of any services provided to Haeger during the in-reach program. The record is also devoid of information regarding Haeger's performance in those programs. Neither this Court nor the circuit court can properly review a Board decision on the basis of an obviously incomplete record. Regardless of fault for the omissions, Haeger's file lacks case summary reports produced following Board interviews, any reports produced following in-reach services, or any TAP that may have been developed with Haeger. These gaps in the record support a single conclusion: that the Board granted Haeger parole in violation of controlling administrative rules and agency regulations.

Absent a complete record and an updated psychological evaluation, we cannot discern whether the Parole Board committed a clear abuse of discretion by granting parole. Accordingly, the circuit court erred by reversing the Board's decision on that ground. We note that the circuit court did attempt to fill the holes in the record, but the Board was less than forthcoming and expedient in providing the necessary information for the court's review. In any event, we will briefly address certain errors in the circuit court's analysis of the Board's actions to prevent any future error.

First, the circuit court correctly noted the internal inconsistency in the COMPAS report. The Board exacerbated the error by failing to remedy or explain the inconsistency until its motion for reconsideration of the court's order of reversal. We do not find the presence of

conflicting information in the report to be dispositive. In other contexts, this Court has repeatedly determined that there is no abuse of discretion when a court or a fact-finder faced with conflicting information makes a reasonable and principled decision regarding which side to believe. See, e.g., *People v Wybrecht*, 222 Mich App 160, 173; 564 NW2d 903 (1997) ("[A] sentence is not invalid because probation agents and a defendant's psychologists use undisputed facts to draw conflicting conclusions about the defendant's character."). The current Board panel read the conflicting statements regarding Haeger's psychological and behavioral health. A member of the current panel also interviewed Haeger and reached his own conclusion regarding Haeger's mentality. The Board chose to believe the COMPAS statement that Haeger did not have criminal ideations, that statement is supported by record evidence, and the Board did not abuse its discretion in granting parole based on that evidence.

Similarly, we reject the circuit court's disregard for the current panel's decision simply because it conflicted with the decisions of previous Parole Board panels. Each and every parole panel faces some conflicting information in making its decision. Each panel member has the discretion to consider the evidence and make a reasonable choice regarding which version of the evidence to believe. It is not an abuse of discretion for two fact-finders to reach different conclusions from the complex and potentially conflicting information within a prisoner's record.

We further reject the circuit court's dismissal of the Board's analysis of various assessment scales. The COMPAS and VASOR assessments and the parole guidelines all include static and dynamic factors. Haeger cannot change the circumstances of his past offense,

and those variables will consistently reduce his overall scores on risk assessments. Haeger may improve his parole outlook, however, by engaging in services toward rehabilitation. Giving the various static and dynamic factors similar weight allows the Board to effectuate both the punitive and rehabilitative features of the corrections system. As our Supreme Court noted in *People v Schultz*, 435 Mich 517, 531-532; 460 NW2d 505 (1990),

> [f]our factors may be taken into consideration to determine the appropriateness of a sentence: rehabilitation, deterrence, the protection of society, and punishment. . . .
>
> *       *       *
>
> . . . [T]he ultimate goal of sentencing in this state is not to exact vengeance, but to protect society through just and certain punishment reasonably calculated to rehabilitate and thereby " 'convert bad citizens into good citizens . . . .' " [Citations omitted.]

Accordingly, we disagree with the circuit court's conclusion that the Board "cherry-picked" the most favorable aspects of Haeger's COMPAS and VASOR assessments. Rather, the Board recognized that Haeger's overall VASOR rating was heavily affected by the circumstances of the sentencing offense. Based on that observation, the Board gave special consideration to Haeger's low risk of recidivism found on both assessments. The Board's seemingly weighted consideration of Haeger's VASOR score is supported by commentary regarding this scale. While incarceration is generally recommended for a prisoner scored as a high risk on the VASOR scale,[18] official sources acknowledge that "the violence risk scale [as it was previously designated] was

---

[18] McGrath & Hoke, p 1.

not designed to nor does it predict sexual or other types of reoffense risk particularly well . . . ."[19] The scale has been renamed "Violence Scale" to reflect that "its primary purpose is to quantify the severity of an individual's violence history rather than the likelihood of violent recidivism."[20]

Ultimately, while the Board properly considered the evidence that was placed before it, it did not have a complete record on which to base the parole decision. The Board violated its regulatory duty to defer its parole decision until Haeger submitted to a psychological or psychiatric evaluation. And the Board or the DOC, or both, failed to maintain careful records documenting Haeger's participation in services and completion of steps necessary for parole. Accordingly, we agree with the circuit court's decision to reverse the Board's grant of parole. This conclusion is not fatal to Haeger's chances for parole. Rather, the Board must now ensure that it considers all necessary information in rendering its parole decision and adequately and accurately documents these steps in the record. After a thorough review as required by statute, regulation, and DOC policy directive, the Board may use its discretion to either grant or deny parole to Haeger.

Affirmed.

Markey, P.J., and Saad, J., concurred with Gleicher, J.

---

[19] *Id.* at 6.

[20] *Id.* at 7.