# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Parole of ARTHUR JOHN STEPHENS.

| | |
|---|---|
| SAGINAW COUNTY PROSECUTOR, | UNPUBLISHED |
| Appellee, | May 22, 2018 |
| v | No. 340097 |
| | Saginaw Circuit Court |
| ARTHUR JOHN STEPHENS, | LC No. 16-031575-AP |
| Other Party, | |
| and | |
| PAROLE BOARD, | |
| Appellant. | |

Before: MURRAY, C.J., and SERVITTO and BOONSTRA, JJ.

PER CURIAM.

The Michigan Parole Board ("the Board") appeals by delayed leave granted[1] the circuit court's order reversing the Board's decision to grant prisoner Arthur John Stephens parole. We reverse and remand for reinstatement of the Board's order granting parole.

## I. FACTS

From 1991 to 1992, Stephens repeatedly molested his niece when she was eight or nine years old. In 2005, Stephens engaged in similar sexual misconduct with his great-niece (his first victim's daughter). Stephens was charged with three counts of first-degree criminal sexual conduct. Stephens pleaded no contest to two counts of third-degree criminal sexual conduct, MCL 750.520d(1)(d), and was sentenced, on July 24, 2006, to 10 to 15 years' imprisonment.

---

[1] *In re Parole of Stephens*, unpublished order of the Court of Appeals, entered October 23, 2017 (Docket No. 340097).

On November 1, 2016, the Board granted Stephens parole. The prosecution appealed the decision to the Saginaw Circuit Court, which held that the Board abused its discretion in granting Stephens parole because Stephens demonstrated a "lack of empathy, insight, acknowledgement, or remorse for his crime," habitually placed himself in the role of the victim, and voluntarily terminated his participation in a prison sex offender therapy program. The circuit court stated that these attributes strongly supported the conclusion that the Board "did not have reasonable assurance that [Stephens] 'will not become a menace to society or to the public safety.' " The circuit court, citing *In re Parole of Haeger*, 294 Mich App 549, 552; 813 NW2d 313 (2011), and *In re Parole of Elias*, 294 Mich App 507, 519; 811 NW2d 541 (2011), also held that, even if the Board did not abuse its discretion, its decision must be reversed because it did not prepare an initial Transitional Accountability Plan (TAP),[2] indicating that the Board did not consider all relevant facts and circumstances as required by Mich Admin Code, R 791.7715(1) and (2)(c)(*iii*).

## II. STANDARD OF REVIEW

When reviewing a circuit court's reversal of the Parole Board's decision to grant parole, this Court must determine whether the Board abused its discretion. See *Haeger*, 294 Mich App at 571; *Elias*, 294 Mich App at 538; *Killebrew v Dep't of Corrections*, 237 Mich App 650, 652; 604 NW2d 696 (1999). The challenging party bears the burden of proving that the Board's decision was either a " 'clear abuse of discretion' or was 'in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation.' " *Elias*, 294 Mich App at 538 (citation omitted); see MCR 7.118(H)(3). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "[A] reviewing court may not substitute its judgment for that of the Board." *Elias*, 294 Mich App at 538-539.

## III. ANALYSIS

In conducting a review of a Board decision, several principles are controlling. For one, "matters of parole lie solely within the broad discretion of the [Board] . . . ." *Elias*, 294 Mich App at 521 (quotation marks and citation omitted; second alteration and ellipsis in original). Even so, the Board is limited in its discretion to grant parole by MCL 791.233(1)(a), which states that "[a] prisoner must not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety." Determinations as to a potential parolee's mental and social attitude may involve a subjective analysis that the objective parole guidelines cannot take into account. *Elias*, 294 Mich App at 542-543.

Importantly, however, under MCL 791.233e(6), when a prisoner is placed at a high probability of parole on the basis of his or her parole guideline score, the Board *must* grant parole

---

[2] "[A] TAP report serves to guide a prisoner on the steps needed to rehabilitate and earn parole . . . . [I]t identifies areas in which the prisoner needs further development and allows the prisoner to work toward achieving stated goals." *Elias*, 294 Mich App at 540.

"absent substantial and compelling reasons to depart from that decision." *Elias*, 294 Mich App at 539. A "substantial and compelling reason" is " 'an objective and verifiable reason that keenly or irresistibly grabs our attention; is of considerable worth in deciding the length of a sentence; and exists only in exceptional cases.' " *Id*. at 542, quoting *Babcock*, 469 Mich at 258. The Department of Corrections (DOC) assessed Stephens a final guidelines score of 7 points, indicating a high probability of parole, meaning that the Board needed to find "substantial and compelling" reasons to depart from the guidelines' suggested course of action. The circuit court did not address the issue, and from our review of the record, none is plainly visible.

Stephens received a psychological evaluation prior to the Board's decision as required by Mich Admin Code, R 791.7715(5)(b). The report indicated that Stephens displayed poor insight, as he repeatedly denied guilt of his crimes, instead claiming that his victims fabricated the accusations. Stephens's therapy termination report and risk assessment noted that he would sometimes make partial admissions of guilt, though they were tempered by minimalizing remarks or further denials. Both the evaluation and therapy termination report stated that Stephens refused to take responsibility for his crimes.

The evaluation also stated, however, that Stephens's short-term and long-term memories were impaired and that he suffered from dementia. His affliction was diagnosed and confirmed by a CT scan in 2013 following a significant fall. Stephens's symptoms worsened over time until he was transferred to the Richard A. Handlon Correctional Facility's Adaptive Skills Residential Program (ASRP). His symptoms were openly observable during the interview with a qualified mental health professional (QMHP). The QMHP noted incidents in which Stephens could not remember how many siblings he had, exhibited disorientation regarding time, and had difficulties articulating words. Stephens's condition rendered him unable to live independently, as his ability to identify complex problems and consider various solutions was severely impaired. The QMHP further stated that, were Stephens placed in new surroundings, he presented a safety risk to himself as a result of his episodes of confusion and poor memory. Moreover, it was unlikely that further incarceration or any program offered by the ASRP would influence his refusal to accept responsibility for his crimes.

Stephens was participating in a Supportive Outpatient Treatment therapy program, and he attended 17 sessions with one excused absence and 10 unexcused absences. During these sessions, he was a limited participant, often struggling to grasp readings topics and subject matter of discussions. Stephens voluntarily dropped out of the program in November 2014. However, the QMHP noted that his deficiencies in participation and performance may have been attributable to age and declining skills. Indeed, his dementia had progressed to the point where Stephens "no longer appeared capable of benefitting from the group." A Correctional Offender Management Profiling for Alternative Sanctions (COMPAS)[3] program was conducted, indicating

---

[3] This Court, in *Elias*, 294 Mich App at 520-521, explained the function of the COMPAS:

> COMPAS is a comprehensive risk and needs assessment system, which takes into account both static information (such as the prisoner's past criminal offenses) and dynamic data (such as the prisoner's evolving attitudes and mental condition).

that Stephens presented low risk for recidivism and violence. Stephens's Vermont Assessment of Sex Offender Risk (VASOR) scores yielded the same result. The QMHP opined that no evidence was presented sufficient to change the assessed risk level at any point.

The existence of conflicting information regarding the propriety of parole does not establish an abuse of discretion so long as the Board makes a reasonable and principled decision as to what is believable. *Elias*, 294 Mich App at 546. Here, the circuit court largely ignored Stephens's cognitive deficiencies, age, and diagnosed dementia, only passingly mentioning Stephens's affliction once in its analysis. Instead, the circuit court focused on evidence of Stephens's heinous conduct toward his victims, poor empathy and insight, denials of guilt, minimization of his crimes, self-victimization, and voluntary termination of sex offender therapy.

The circuit court compared the present facts to cases in which this Court affirmed the reversal of parole for a prisoner with an extensive history of criminal activity, violent assault, and substance abuse, and where a bipolar prisoner refused medication and never attended sex offender therapy despite encouragement to do so. Neither of the unpublished opinions cited by the circuit court concerned aged prisoners afflicted with dementia. Moreover, Stephens shares none of the attributes previously described. He had no prior criminal convictions other than the active crimes, and the record disclosed no history of substance abuse other than "[o]ccasional alcohol" use. He was also compliant in taking his prescribed medication and participated in sex offender therapy until his mental affliction had worsened to a point where he could no longer benefit from the program. Ultimately, the Board determined, after examining all the facts and circumstances, that Stephens was suited for parole. It was not for the circuit court to substitute its judgment for that of the Board. See *Elias*, 294 Mich App at 538-539.

We are also unpersuaded by the prosecution's argument that the Board violated its regulatory duties under Mich Admin Code, R 791.7715(1) and (2)(c)(*iii*) when it failed to produce a TAP for Stephens at intake. Under Mich Admin Code, R 791.7715(2)(c)(*iii*), the parole Board "*may* consider," in determining the propriety of parole, a prospective parolee's readiness for release as demonstrated by "[d]evelopment of a suitable and realistic parole plan." (Emphasis added.) Use of the term "may" in regulations denotes permissive, discretionary action, as opposed to mandatory action. *Walters v Nadell*, 481 Mich 377, 383; 751 NW2d 431 (2008) (noting that "the term 'may' is typically permissive"); *People v Brown*, 249 Mich App 382, 386; 642 NW2d 382 (2002) ("The statutory term 'may' is permissive, as opposed to the term 'shall,' which carries a mandatory, nondiscretionary connotation."). Nevertheless, the prosecution argues that under this Court's decisions in *Haeger*, 294 Mich App at 576-577, and

---

COMPAS is designed to support treatment, programming and case management decisions. The various COMPAS reports describe the offender's risk and criminogenic needs. The fundamental task is to connect the dots among the various factors and develop a more integrated and coherent interpretation of each [person's] support needs. [Quotation marks and citations omitted.]

The COMPAS identifies the criminogenic factors that contribute to risk as used in a TAP. *Id*. at 520.

*Elias*, 294 Mich App at 519-520, 540, the DOC and the Board are *required* to consider a TAP for each prospective parolee.

In *Elias*, we examined the DOC's recently promulgated policy requiring the preparation of TAPs for all prisoners:

> In 2005, the DOC began implementing the Michigan Prisoner ReEntry Initiative (MPRI) in various stages. The MPRI is a multiagency, multicommunity project designed to promote public safety and reduce the likelihood of parolee recidivism. *The MPRI Model: Policy Statements and Recommendations,* Michigan Prisoner ReEntry Initiative, January 2006, p. 2. The mission of the MPRI "is to significantly reduce crime and enhance public safety by implementing a seamless plan of services and supervision developed with each offender and delivered through state and local collaboration . . . ." DOC Policy Directive 03.02.100, p. 1. One goal of the MPRI is to "improve[] decision making at critical decision points," such as when the Board is considering whether to release a prisoner from incarceration on parole. *Id.* at ¶¶ C, E.2, pp 1– 2. *Under the MPRI, the DOC and the Board are now required to prepare and consider additional reports, and in particular the transition accountability plan (TAP)*:
>
> > The lynchpin of the MPRI Model is the development and use of Transition Accountability Plans (TAPs) at four critical points in the offender transition process that succinctly describe for the offender, staff, and community exactly what is expected for offender success. The TAPs, which consist of summaries of the offender's Case Management Plan at critical junctures in the transition process, are prepared with each prisoner . . . at the point of the parole decision . . . . [*MPRI Model*, p 5.]
>
> A staff member from the DOC *must formulate a TAP* with each prisoner, mostly to assist the prisoner's reentry into society, but also to assist the Board in rendering its parole decision. [*Elias*, 294 Mich App at 519-520 (emphasis added).]

In *Haeger*, 294 Mich App at 577, we further noted that

> [i]n the 2008 appropriations act for the DOC, 2008 PA 245, § 403(8), the Legislature made the DOC's 2009 appropriation contingent on the imposition of a TAP requirement, stating that the DOC "shall ensure that each prisoner develops a [TAP] at intake in order to successfully reenter the community after release from prison. Each prisoner's [TAP] shall be reviewed at least once each year to assure adequate progress." Although the DOC did not formally require that TAPs be prepared with potential parolees until March 2010, it is apparent that these reports were already in widespread use by then.

Although the circuit court correctly noted that our decisions in *Haeger* and *Elias* make it clear "that a TAP is a very relevant consideration in regard to a prisoner's parole and that a TAP should be considered prior to parole being granted," there is no basis for the additional conclusion that the Board abused its discretion and failed to comply with the administrative rules merely because no "initial" TAP was in the record. As noted, under Mich Admin Code, R 791.7715(2)(c)(*iii*), the Board "*may* consider" readiness for release as demonstrated by "[d]evelopment of a suitable and realistic parole plan." (Emphasis added.) Under the plain language of the Rule, then, the Board is not *required* to consider *any* specific plan, let alone a TAP. Furthermore, this Court did not hold, in either *Haeger* or *Elias*, that the Board's failure to consider a TAP—initial or otherwise—before granting parole alone constitutes an abuse of discretion. Rather, while the *Haeger* Court did conclude that the Board abused its discretion, in part, by failing to prepare or consider a TAP, this was only one of several "omissions" in Haeger's file that, together, indicated that the Board had "violated its duty to 'consider[] all relevant facts and circumstances,' Mich Admin Code, R 791.7715(1), 'in determining whether parole is in the best interests of society and public safety,' Mich Admin Code, R 791.7715(2)." *Haeger*, 294 Mich App at 576-581 (alteration in original). In any event, as in *Elias*, the lower court record in this case did reference at least one TAP completed on Stephens's behalf, though the parties concede that it was not prepared at intake. And in contrast to the circumstances at issue in *Haeger*, 294 Mich App at 576-581, the Board in this case did not circumvent its regulatory duty to consider all the evidence and circumstances under a complete record when it granted Stephens's application for parole. See *Elias*, 294 Mich App at 540. Rather, the Board considered all necessary evidence and circumstances of the case with a sufficiently complete record to determine that reasonable assurances existed that defendant would not be a menace to society or to the public safety. See *id*. at 542-543.

For these reasons, the circuit court erred when it determined that the Board had committed a reversible abuse of discretion when it granted Stephens parole. Accordingly, we reverse the order of the circuit court and remand for reinstatement of the Board's order granting parole. We do not retain jurisdiction.


/s/ Christopher M. Murray
/s/ Deborah A. Servitto
/s/ Mark T. Boonstra

-6-