# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* PAROLE OF LARRY LANDRY.

---

MACOMB COUNTY PROSECUTOR,

      Appellee,

v

LARRY LANDRY,

      Defendant,

and

MICHIGAN PAROLE BOARD,

      Appellant.

UNPUBLISHED
October 8, 2015

No. 326010
Macomb Circuit Court
LC No. 2014-003453-AP

---

Before: RONAYNE KRAUSE, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

The Michigan Parole Board granted Larry Landry parole after he had served approximately 6 years of a 4 to 15-year sentence. The Macomb County Prosecutor objected to Landry's release and sought leave in the circuit court to appeal the Board's parole decision. The circuit court granted leave and thereafter reversed the Board. The court ruled that the Board's parole decision violated MCL 791.233(1)(a)'s mandate that the Board have "reasonable assurance" that the prisoner "will not become a menace to society or to the public safety," and amounted to an abuse of discretion. The circuit court invaded the Board's discretionary power by reversing the grant of parole on the grounds cited. Accordingly, we reverse the circuit court order and reinstate the grant of parole.

## I. BACKGROUND

In the summer of 2007, then 64-year-old Larry Landry was arrested on charges of criminal sexual conduct (CSC) raised by three young girls. Over a period of several months, Landry sexually abused the 6, 9, and 11-year-old granddaughters of his girlfriend. He showed the girls pornographic videos and bribed and threatened them into allowing him to fondle their

-1-

breasts and vaginas and perform oral sex upon them, and to coerce the children to perform fellatio upon him. Landry pleaded nolo contendere to three counts of second-degree CSC, in exchange for the dismissal of various other charges, and the court sentenced him to concurrent sentences of 4 to 15-years' imprisonment.

At the time of sentencing, Landry blamed his victims and made excuses for his conduct. Landry described in the presentence investigation report (PSIR) that the girls happened upon him while he was watching pornography and masturbating. He contended that the girls asked him several sexual questions. Landry accused the children of "fondl[ing] themselves which enticed [him] to touch & fondil [sic] & lick victim privates." The interviewer asked Landry "how he felt about what happened," and Landry responded that he knew his actions were "wrong," but that he "thought [he] was teaching them things that would answer their questions."

Landry also reported in the presentence interview that he had been sexually abused twice as a child. He first described that when he was 9 years old, his 12 and 13-year-old sisters "had sex with him." He then asserted that when he was 13, an old man picked him up while he was hitchhiking to school. The man performed fellatio on him and paid him. Landry never reported these incidents because he claimed "I am not a snitch. It was something different. It was an experience. I was being taught something and it felt good."

Upon Landry's imprisonment in early 2008, he submitted to an intake psychological examination. Landry "denied any abuse within [his childhood] home," but described sexual abuse at the hands of "an older neighbor" when he was 13 years old. The evaluating psychologist rendered opinions on Landry's level of stress and anxiety and his ability to cope with these emotions. However, the report included no assessment of Landry's psyche in relation to his criminal offenses.

When Landry first entered prison, he was not a model prisoner. He acted out against the guards and other prisoners and committed eight major misconducts. Landry's final misconduct was in September 2008, when he threw "pudding water" at a guard in the cafeteria. Landry's violent tendencies were not unknown before he entered prison. In 1989, Landry savagely beat his mother and received a year's probation for aggravated assault. In 2000, Landry assaulted a female stranger with a knife and received 18 months' probation. However, Landry received no misconduct tickets after the September 2008 incident.

Landry first became eligible for parole consideration on July 29, 2011, after serving his four-year minimum sentence. Landry participated in a six-month round of sexual offender therapy (SOT) in 2011, during which time he attended 39 sessions. His therapy termination report, prepared days before his minimum-sentence expiration, was less than favorable. The therapist reported that early in the program, Landry was evasive, made excuses and did not accept responsibility for his conduct, lacked remorse, and blamed his victims and his girlfriend for his crimes. Landry repeated his claims that the children caught him watching pornography and asked many sexual questions "as if they were trying to flirt with him." Landry "tried to get the therapist and the group to believe . . . that he felt he should educate" the children, but this "was just an excuse to stimulate himself," the therapist opined. The therapist noted that Landry was never fully honest about the acts he committed against his victims. And Landry "could not see that he was exploiting [the victims'] innocence." Landry changed his story about his own

-2-

abuse as a child, omitting mention of the assault by an older male when he was 13, and adding that he had been "sexually molested . . . by two young adolescent sisters of a male friend." Landry used these incidents as an excuse for his actions. He also claimed that he had "a 'second childhood,' meaning that he enjoyed being molested by older girls during" his childhood. Landry also tended to say what he thought the therapist wanted to hear, without any real show of emotion.

The therapist continued that Landry's group participation was "fair to poor" and that he made only a "weak attempt." His comments were unhelpful and he did not seek rehabilitation, in the therapist's estimation. In creating his relapse prevention plan, Landry copied from the workbooks and did not customize the steps to fit his situation. Accordingly, it was "not clear" whether he would or could implement his plan. Ultimately, the therapist concluded that Landry "continue[d] to be a risk to children, particularly pre-pubescent girls." "The only test of whether Mr. Landry will molest again," the therapist stated, "is when he has the opportunity, and he does not have such in prison." The therapist graded Landry on 28 points under the categories of "General Group Participation" and "Progress Toward Goals/Objectives." Landry achieved 26 "fair" and "poor" grades, but only 2 "good" grades for remaining misconduct-free during the program and managing his anger during group sessions. The Michigan Department of Corrections (MDOC) provided Landry's therapy termination report to the Parole Board for its consideration.

In preparation of the Parole Board's consideration, the MDOC prepared and considered various reports under the Michigan Prisoner Reentry Initiative (MPRI), most of which will be discussed in detail within.

> The MPRI is a multiagency, multicommunity project designed to promote public safety and reduce the likelihood of parolee recidivism. *The MPRI Model: Policy Statements and Recommendations*, Michigan Prisoner ReEntry Initiative, January 2006, p 2. The mission of the MPRI "is to significantly reduce crime and enhance public safety by implementing a seamless plan of services and supervision developed with each offender and delivered through state and local collaboration . . . ." DOC Policy Directive 03.02.100, p 1. One goal of the MPRI is to "improve[] decision making at critical decision points," such as when the Board is considering whether to release a prisoner from incarceration on parole. *Id.* at ¶¶ C, E.2, pp 1-2. Under the MPRI, the DOC and the Board are now required to prepare and consider additional reports, and in particular the transition accountability plan (TAP):

>> The lynchpin of the MPRI Model is the development and use of Transition Accountability Plans (TAPs) at four critical points in the offender transition process that succinctly describe for the offender, staff, and community exactly what is expected for offender success. The TAPs, which consist of summaries of the offender's Case Management Plan at critical junctures in the transition process, are prepared with each prisoner . . . at the point of the parole decision . . . . [MPRI Model p 5.]

A staff member from the DOC must formulate a TAP with each prisoner, mostly to assist the prisoner's reentry into society, but also to assist the Board in rendering its parole decision. A TAP contains four elements:

> ➢ Needs are criminogenic factors that contribute to risk and are individually assessed using the COMPAS risk assessment instrument.

> ➢ Goals are designed to mitigate each criminogenic need.

> ➢ Tasks are developed with each offender to meet the goals defined in the plan.

> ➢ Activities are created with each offender to break each task down into manageable steps.  [*In re Parole of Elias*, 294 Mich App 507, 519-520; 811 NW2d 541 (2011).]

The MDOC prepared a cursory TAP with Landry on January 30, 2011.  The document includes generic goals, such as "Address Mental Health/Abuse/Sexual Issues" and "Increase Positive Social Supports with Family, Friends, and Community."  There is no record indication, however, that the MDOC conducted annual reviews of the TAP with Landry.

> In the 2008 appropriations act for the DOC, 2008 PA 245, § 403(8), the Legislature made the DOC's 2009 appropriation contingent on the imposition of a TAP requirement, stating that the DOC "shall ensure that each prisoner develops a [TAP] at intake in order to successfully reenter the community after release from prison.  Each prisoner's [TAP] shall be reviewed at least once each year to assure adequate progress."  [*In re Parole of Haeger*, 294 Mich App 549, 577; 813 NW2d 313 (2011).]

The MDOC also calculated Landry's parole guidelines leading up to his 2011 parole consideration.

> Statutorily mandated parole guidelines form the backbone of the parole-decision process.  As described by this Court in *In re Parole of Johnson*, 219 Mich App 595, 599; 556 NW2d 899 (1996), "[t]he parole guidelines are an attempt to quantify the applicable factors that should be considered in a parole decision" and are "intended to inject more objectivity and uniformity into the process in order to minimize recidivism and decisions based on improper considerations such as race."  [*Elias*, 294 Mich App at 512.]

In MCL 791.233e, the Legislature directed the MDOC to promulgate detailed guidelines and outlined several factors to be incorporated.  The MDOC complied by codifying the parole guidelines in Mich Admin Code, R 791.7715.  As described in *Haeger*, 294 Mich App at 553-554:

> The Board must determine "whether parole is in the best interests of society and public safety" considering the prisoner's past and current criminal behavior,

"[i]nstitutional adjustment," "[r]eadiness for release," "personal history and growth," and "physical and mental health." Mich Admin Code, R 791.7715(2). Moreover, when a prisoner has a history of "predatory or assaultive sexual offenses," the prisoner must undergo a "psychological or psychiatric evaluation before the release decision is made . . . ." Mich Admin Code, R 791.7715(5).

The DOC regulations further direct the Board to consider "all relevant facts and circumstances, including the prisoner's probability of parole as determined by the parole guidelines . . . ." Mich Admin Code, R 791.7715(1). The guidelines, in turn, require that scoring be based on the prisoner's time served as well as the "aggravating and mitigating circumstances" of the sentencing offense, the "prisoner's prior criminal record," the number of major misconducts committed by the prisoner within the preceding one- and five-year periods, the prisoner's score on "risk screening scales," the prisoner's age, the prisoner's performance in recommended institutional programs, and "[t]he prisoner's mental health" status. Mich Admin Code, R 791.7716(3). The guideline factors are separated into eight sections, each with a list of subfactors to be scored and instructions on the point value to be assigned. *Elias*, 294 Mich App at 517, citing DOC Policy Directive 06.05.100, Attachment A, pp 1-9. The aggregated score is " 'used to fix a probability of parole determination for each individual on the basis of a guidelines schedule. Prisoners are categorized under the guidelines as having a high, average, or low probability of parole.' " *Elias*, 294 Mich App at 518, quoting *Johnson*, 219 Mich App at 599.

As assessed on February 16, 2011, Landry's parole guidelines score was -12, representing an average probability of parole. Considering Landry's guideline score, various evaluations, and unsatisfactory SOT termination report, the Parole Board denied Landry parole on September 12, 2011. To improve his chances of parole, the Board recommended that Landry "[d]emonstrate responsible behavior" and comply with suggestions received during therapy.

Landry continued working toward release following the Board's initial decision. In the summer of 2012, Landry completed a 22-lesson program entitled "Thinking for Change." Landry received all "poor" and "fair" marks in categories such as "self awareness" and "problem identification/solving," and an overall "fair" report. The evaluator commented that Landry "had difficulty focusing on his criminal thinking and how it has affected his life thus far." With assistance from another group member, Landry "beg[a]n to recognize how these thoughts have controlled his life."

On October 18, 2012, Landry was assessed under the Correctional Offender Management Profiling for Alternative Sanctions program (COMPAS), and the assessment was updated on May 29, 2013. This Court described COMPAS in *Elias*, 294 Mich App at 520-521 (quotation marks and citations omitted), as follows:

COMPAS is a comprehensive risk and needs assessment system, which takes into account both static information (such as the prisoner's past criminal offenses) and dynamic data (such as the prisoner's evolving attitudes and mental condition). COMPAS is designed to support treatment, programming and case management

-5-

decisions. The various COMPAS reports describe the offender's risk and criminogenic needs. The fundamental task is to connect the dots among the various factors and develop a more integrated and coherent interpretation of each persons [sic] support needs.

In conducting a COMPAS risk assessment, a case manager considers various characteristics of the offender and the offense and inputs scores into the COMPAS computer software program. The software generates a score ranking the offender's statistical likelihood of violence, recidivism, success on parole, and other factors. The COMPAS program incorporates information gleaned from the offender's prior criminal history, drug involvement, early indicators of juvenile delinquent problems, and criminal associations to assess a general recidivism risk. The prisoner's history of violent or assaultive crimes, prior use of weapons, past parole experience, and other similar factors contribute to the prisoner's violent recidivism risk. COMPAS also assesses more benign factors such as the level of the prisoner's family support and the prisoner's ability to gain employment, manage his or her finances, and find suitable housing once paroled.

Landry's COMPAS assessment showed him to be at low risk of violence and recidivism and requiring a low level of supervision on parole.

On February 25, 2013, Landry was evaluated under the Vermont Assessment of Sex Offender Risk (VASOR) scale. This Court described the VASOR scale in *Haeger*, 294 Mich App at 564-565, quoting McGrath & Hoke, Vermont Assessment of Sex Offender Risk Manual (Research ed, 2001), p 1 (citations omitted):

The [VASOR] is a risk assessment scale for adult male sex offenders age 18 and older. It was originally designed to assist probation and parole officers in making placement and supervision decisions. Because the VASOR does not provide a comprehensive survey of all factors relevant to sexual offending, it is best used as a decision aid along with professional judgement [sic] and other appropriate tools. Although reliability and validity studies are encouraging, it still should be considered an experimental instrument.

* * *

The VASOR is composed of two scales, a 13-item reoffense risk scale and a 6-item violence scale. The reoffense risk scale is designed for assessing the likelihood of sexual recidivism. The violence scale is designed for assessing the nature of an individual's violence history and offense severity. The interaction of these variables, reoffense risk and violence, are considered important factors for determining an individual's overall risk level.

* * *

-6-

The scoring process ideally should include an interview with the individual, in addition to carefully reviewing correctional case file information.

Scores on the two VASOR scales are plotted on a scoring grid where their intersection falls into one of three risk categories; low, moderate, or high. These risk categories can be used to inform placement and supervision decisions. Offenders who score in the "low" range (i.e., low reoffense risk score and low violence score) are generally considered appropriate for community supervision and treatment. Offenders who score in the "moderate" range may or may not be considered appropriate for community placement. Offenders who score in the "high" range (i.e., high reoffense risk score and/or high violence score) are generally considered inappropriate for community supervision and treatment. For public protection purposes, incarceration is generally recommended for offenders who score in the "high" range.

Notably, VASOR is "designed to be scored easily by probation and parole officers and correctional caseworkers." [Alterations in original.]

Landry received 18 points on the "reoffense risk scale" and 35 points on the "violence scale." As Landry had committed no acts of violence during any sexually assaultive crime, his violence score was calculated solely from his nonsexual assault offenses in 1989 and 2000. Landry was placed in the moderate "violence level" and low "reoffense risk level" for an overall risk level of moderate.

Landry participated in a second round of SOT with a different therapist in 2013. On March 18, 2013, in preparation for the SOT, the MDOC prepared a Qualified Mental Health Professional Evaluation (QMHP), describing Landry's results on various evaluation scales. During an interview with that therapist, Landry reported that when he was 16 years old, his male employer performed fellatio on him several times during a six-week period. Landry described that he was motivated to commit CSC against the victims when he used the bathroom while the girls were in the bathtub together. He claimed that the children "pulled back the curtain" and "showed interest" in him. He also blamed his conduct on his frustration over his impotence. However, Landry admitted the specific details of how he convinced the children to participate and the acts he committed against them. The report indicated that "Mr. Landry expressed responsibility for the offense, and voiced superficial stereotypical remorse. He presented very little empathy or insight." Landry verbally accepted responsibility but still shifted the blame onto the children, and although he could cite risk factors to committing CSC, he was unable to connect those triggers to his own conduct.

After attending 49 SOT sessions, another therapist assigned Landry grades of good and fair in all categories. The therapist opined that Landry "was a fair participant in group," who consistently made an effort. The report continued, "At times he was able to give relevant feedback and connect ideas to his offense. However, much of the time it seemed he had a limited grasp of many concepts and his contributions to discussion would end up being tangential or using terminology incorrectly." Yet, Landry offered support to other group members and

completed his assignments with a "fair" level of understanding. The therapist noted that at the beginning of the program, Landry tried to shift the blame onto his victims and at one point tried to minimize the severity of another group member's offenses.

> However, *as group progressed Mr. Landry did make improvement*. He was able to recognize his sense of entitlement, his use of grooming the victims, and his justification of the abuse. He acknowledged in group that he rationalized his behavior by using his impotence as well as the distortion that he was "teaching" his victims, in a similar way that he had been taught about sex. He had other partial insight in being able to admit his attraction to the victims, yet he denied any previous attraction to young girls and denied he would be attracted to young girls in the future. *Overall, Mr. Landry made progress with some degree of understanding and insight into some of his deviant thinking.* [Emphasis added.]

Moreover, "[i]t was apparent that Mr. Landry put effort into his Relapse Prevention Plan." Landry did not reflect "complete understanding at all levels of the ideas discussed in group," but "illustrate[d] enough understanding to make progress in exploration of the dynamics of his offense." "Like the rest of his participation," the report states, the relapse prevention plan "reflected progress with room for continued growth and exploration."

In the November 27, 2013 QMHP and therapy termination report, the evaluator considered Landry's COMPAS and VASOR scores cited in the March QMHP. The evaluator also relied on STATIC-99R testing conducted on March 15, 2013, noting:

> [Landry] was scored on the Static-99R to determine appropriate treatment intensity and as part of future comprehensive risk assessments. The Static-99R relies on research supported, unchangeable, historical factors to provide a measure of relative risk for sexual offense recidivism. Static-99R has shown moderate accuracy in ranking offenders to their relative risk for sexual recidivism. Furthermore, its accuracy in assessing relative risk has been consistent across a wide variety of samples, countries, and unique settings.

> [Landry] received a total score of (-1) which places him in the "Low" Risk Category relative to other adult male sex offenders, for being charged or convicted of another sexual offense. For a score of (-1): the recidivism rate of sex offenders with the same score as prisoner would be expected to be approximately half (.45) the recidivism rate of a "typical" sex offender as defined by a median score of (2) on the Static-99R.

On June 24, 2013, the Board again denied Landry parole. The Board noted that Landry "needs to continue to develop insight and a relapse prevention plan." The Board also commented that Landry's "insight into his deviant/criminal behavior is limited. [Landry] is still considered a risk to the public." To increase his potential for parole, the Board recommended that Landry "[d]emonstrate responsible behavior," avoid prison misconduct, "[i]dentify and develop community resources to address special needs identified through group therapy," and comply with any further treatment suggestions.

Landry was again considered for parole in August 2014. In preparation, the MDOC recalculated Landry's parole guidelines. This time, Landry's total score rose to -1, which still represented an "average probability of parole," but hovered nearer the "high probability" border.[1]

The MDOC prepared a case summary report for the Board's review. The report cited Landry's good block reports and his acceptance of responsibility for his earlier prison misconducts. The report further noted that Landry expressed remorse for his CSC offenses and stated that "his crimes effected [sic] the [victims] horribly." The evaluator opined that Landry's post-release plan to live with his grown son in Alaska was "acceptable." The prescreener interviewed Landry and reported:

> OK interview, better than fair, but not ggod [sic]. [Prisoner] is hoping to be parolled to his son's home in Alaska. [Prisoner] completed [SOT] with a fair making some gains after starting off slow. [Prisoner] states his temper[a]ment has changed for the better, [prisoner] says he doesn't get as excited as he use [sic] to over issue. [Prisoner] pland [sic] to work for his son's business. [Prisoner] wants to make better decisions. [Prisoner] states he does not fly off the handle has [sic] much as he use [sic] to. [SOT] risk assessment is low-moderate[.] [Prisoner] is 70 years of age.

More specifically, in relation to Landry's completion of SOT, the report noted that Landry "did make improvements, and was able to recognize his sense of entitlement, and [justification] of the abuse. Overall [prisoner] made progress [with] some degree of understanding and insight into some of his deviant thinking."

Ultimately, on August 6, 2014, a two-member Board panel found that "reasonable assurance exists that the prisoner will not become a menace to society or to the public safety" and granted Landry parole. Landry's parole conditions included registering as a sex offender, GPS monitoring, and continued SOT if required by his parole officer.

The Macomb County Prosecutor filed an application to appeal the parole decision in the Macomb Circuit Court. The prosecutor contended that in determining whether Landry remained "a menace to society or the public safety," "the Parole Board did not sufficiently consider . . . 'all of the facts and circumstances, including the prisoner's mental and social attitude' under MCL 791.233(1)(a)." The court granted the application.

At the circuit court hearing, the prosecutor urged the court to reverse the Board's decision. The prosecutor emphasized that Landry had a prior criminal record. She decried Landry's performance in SOT, including the ratio of "fair" to "good" scores following the second round. She contended that Landry's advanced age should not be considered as a mitigating factor as he committed his CSC offenses in his 60s. The prosecutor also focused on

---

[1] "A prisoner with a score of +3 or greater merits placement in the high-probability category," while "a score of -13 or less warrants assignment to the low-probability category." *Elias*, 294 Mich App at 518.

Landry's history of sexual abuse as a child, which he wrote off as a learning experience that he enjoyed, and the connection to his excuse for committing the current offenses—that he was teaching the child victims. Overall, the prosecutor did not believe that Landry had sufficiently benefited from SOT and opined that Landry continued to pose a threat to young children.

The Board's counsel countered that Landry had shown marked improvement through therapy. He noted Landry's evaluation scores placing him in the low to moderate risk of recidivism range. Counsel recalculated the parole guidelines without giving Landry credit for his age and his score remained in the average-probability-of-parole range. Counsel further expressed little concern over Landry's earlier excuses for his crimes, asserting that it is common for those who sexually abuse children to claim they were teaching the victims. The Board had discretion to grant parole, considered all the evidence before it, and acted reasonably, counsel concluded.

The circuit court reversed the Board's parole decision. After reviewing the various reports and assessments in the Board's file, the court ruled:

> The Court is mindful that appellee has shown improvement. This does not necessarily mean that he satisfies all of the requirements for parole. In particular, the Court finds that the QMHP stated that "[o]verall, Mr. Landry made progress with **some** degree of understanding and insight into **some** of his deviant thinking." [emphasis added] Such statement must be considered together with the fact that even after 2 rounds of SO[T], [Landry] failed to comprehend all ideas discussed and demonstrated only "fair" coping strategies. Therefore, after considering all of the facts and circumstances, there is no reasonable assurance that appellee will not become a menace to society or to the public safety, as mandated by MCL 791.233(1)(a). Accordingly, the Court concludes that the Board's decision was contrary to MCL 791.233(1)(a), as well as amounted to an abuse of discretion because it fell outside the range of reasonable and principled outcomes. [*Elias*, 294 Mich App] at 538. See also MCR 7.118(H)(3)(a)-(b). Accordingly, the Board's decision granting parole to appellee shall be reversed. [First and second brackets and bold in original.]

## II. STANDARD OF REVIEW

"Judicial review of the Board's decision to grant parole is limited to the abuse-of-discretion standard." *Elias*, 294 Mich App at 538. MCL 791.234(11) extends to the prosecutor and the crime victim the right to appeal in the circuit court the Parole Board's decision to grant parole. *Id.* "[T]he challenging party has the burden to show either that the Board's decision was 'a clear abuse of discretion' or was 'in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation.' " *Id.*, quoting MCR 7.104(D)(5).[2] "An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable

---

[2] The court rule cited in *Elias* has since been renumbered. Its content is now located at MCR 7.118(H)(3).

and principled outcomes." *Id*. Neither the circuit court nor this Court may substitute its judgment for that of the Board. *Id*. at 538-539.

## III. ANALYSIS

While the Parole Board has broad discretion with regard to parole, *Elias*, 294 Mich App at 521, there are limitations on its authority. "A prisoner shall not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety." MCL 791.233(1)(a). The Board must consider "all relevant facts and circumstances, including the prisoner's probability of parole as determined by the parole guidelines." Mich Admin Code, R 791.7715(1). The Parole Board may depart from the guidelines by denying parole to a prisoner with a high probability of parole under the guidelines, or by granting parole to a prisoner with a low probability of parole, only for substantial and compelling reasons. MCL 791.233e(6). Here, Landry's parole guideline score gave him an "average" probability of parole. As Landry fell in neither extreme, the reasons supporting the Board's decision did not need to be substantial or compelling:

> If respondent may parole low probability prisoners for substantial and compelling reasons only, and deny parole to high probability prisoners for substantial and compelling reasons only, MCL 791.233e(6), it follows that the Parole Board may grant or deny parole to average probability prisoners *for legitimate reasons that are neither compelling nor substantial*. Thus, while the parole guidelines provide greater restrictions on respondent's exercise of discretion concerning a prisoner at either extreme, the guidelines *allow for a broader exercise of discretion in the case of a prisoner with an average probability of parole*. [*Killebrew v Dep't of Corrections*, 237 Mich App 650, 655-656; 604 NW2d 696 (1999) (emphasis added).]

It is important to note that the Parole Board's reasons for granting parole need not be completely objective. For instance, " '[a]n evaluation of a prisoner's mental and social attitude involves a subjective determination for which the parole guidelines cannot account.' " *Elias*, 294 Mich App at 543, quoting *Killebrew*, 237 Mich App at 655.

The Parole Board acted within its discretion in granting Landry parole as its decision was supported by legitimate reasons and was within the parameters of the various statutes and administrative rules governing parole procedures.

The MDOC and Parole Board followed all statutory and regulatory procedures for evaluating Landry's probability of parole. As described in *Elias*, 294 Mich App at 511-518, the MDOC compiled all relevant materials and data for the Parole Board's review and calculated Landry's parole guidelines score. The MDOC subjected Landry to risk assessment under the COMPAS, VASOR, and STATIC-99R evaluation methods as required by the MPRI. See *id*. at 519-521; *Haeger*, 294 Mich App at 564-565. Landry participated in two rounds of sexual offender therapy and a "Thinking for Change" program while imprisoned. Although the 2013 QMPH is not entitled "psychological evaluation," it reveals that Landry was evaluated by a limited license psychologist before the Board's parole decision as required by Mich Admin

Code, R 791.7715(5)(b) (requiring psychological or psychiatric evaluations for all parole candidates with a history of "[p]redatory or assaultive sexual offenses").  See also *Haeger*, 294 Mich App at 577.  And although the only TAP available in the record was prepared on January 30, 2011, it is clear the MDOC continued to explore with Landry his transition into society as required under the MPRI.  During SOT, for example, Landry prepared a relapse prevention plan.  He also arranged to live and work with his son in Alaska.

As all the building blocks were in place and Landry had an average probability of parole, the decision to grant parole fell squarely within the Board's discretion.  Likely lurking in the Board members' minds were that Landry was 70 years old (now 72), often wheelchair bound, and planning to move to sparsely populated Alaska.  Between 2011 and 2013, Landry made adequate strides toward rehabilitation.  Landry gained insight into his behavior and began to take responsibility for his wrongdoings.  Landry developed a feasible relapse prevention plan.  He remained a model prisoner and his pattern of misconduct fell into the distant past.  All these factors amount to legitimate reasons to grant parole.

Landry's various risk-assessment scores also weigh in support of the Parole Board's decision.  Landry's parole guidelines score rose from a -12, on the cusp of the low-probability-of-parole category, to a -1.  Landry's COMPAS and STATIC-99R assessments showed him to be at low risk of recidivism and violence.  His VASOR assessment fell in the moderate-risk category but only because of his violent offenses that are now more than 15 years old.  These scores provided reasonable assurance that Landry would not commit new sexual offenses if released on parole.

It is true that Landry did not exhibit spectacular growth while in prison.  However, neither astronomical leaps nor substantial and compelling grounds were required for the Board to exercise its discretion to grant parole in this case.  Landry made adequate strides toward rehabilitation and considering all the facts and circumstances, the Board had reasonable assurances that Landry would not be a danger or menace to society.  The circuit court invaded the Board's discretionary province by injecting its own judgment into the mix.  This was not permitted.

We therefore reverse the circuit court's opinion and order and reinstate the Board's parole decision.  We do not retain jurisdiction.


/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens