# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Parole of STEVEN J. STRUTZ.

---

MACOMB COUNTY PROSECUTOR,

        Appellee,

v

STEVEN J. STRUTZ,

        Appellant,

and

MICHIGAN PAROLE BOARD,

        Intervenor-Appellant.

UNPUBLISHED
February 9, 2016

No. 323101
Macomb Circuit Court
LC No. 14-001039-AP

---

Before: SAWYER, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

In February of 2014, the Michigan Parole Board (the Board) issued a decision to grant parole to Steven J. Strutz. The Macomb County Prosecutor objected to Strutz's release and filed a motion to stay proceedings and an emergency application for leave to appeal in the circuit court. By stipulation of the parties, the Board was allowed to intervene and argue why it did not abuse its discretion in deciding to grant parole to Strutz. The circuit court determined that the Board had abused its discretion, and thus, it entered a May 12, 2014 opinion and order reversing the Board. Because the prosecution did not meet its burden of establishing that the Board clearly abused its discretion when it granted parole to Strutz, and because the circuit court invaded the Board's authority and substituted its judgment for that of the Board, we reverse the circuit court's order and remand for reinstatement of the Board's grant of parole.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of Strutz's grant of parole from his imprisonment for his March 26, 1999 convictions for second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, which followed his plea of *nolo*

-1-

*contendere* to such charges. Strutz's criminal convictions arise out of his actions on June 27, 1997. Strutz had been married to Margaret Strutz for 14 years and had two daughters before divorcing. Strutz took the divorce badly and admitted to abusing alcohol as a coping mechanism. His ex-wife began to date another man, Michael Gibson (Gibson). On June 27, 1997, Strutz's ex-wife came to his home along with Gibson to drop off Strutz's daughters for visitation. At the time, Strutz had been drinking for a week and was suicidal. He was so intoxicated that he has no memory of the incident, but witnesses, including Strutz's ex-wife, reported what happened. Strutz's daughters were crying and screaming, and he was trying to console them. At some point, Strutz stood up from speaking with his daughters, retrieved a gun, and fatally shot Gibson four times in the back. Strutz was arrested at the scene and convicted pursuant to his plea. The trial court sentenced him to 18 to 40 years for the second-degree murder conviction, to be served consecutively to a two-year sentence for his felony-firearm conviction.

Because of credit given for time served on the felony-firearm conviction, Strutz became eligible for parole for the first time in 2013, when he was 54 years old. On July 2, 2013, a short time before he became eligible for parole, Strutz received a major misconduct ticket for possessing dangerous contraband. Strutz had complained to prison officials that he was in danger from other prisoners involved in gang activity. He subsequently cut his wrists using a razor blade and received a major misconduct for possessing the razor blade, which is classified as dangerous contraband. Strutz administratively appealed the major misconduct decision, arguing that he should not be held accountable for possessing the razor blade because his abnormal mental state made him unable to control his actions. His administrative appeal was denied, with the prison officials reasoning that Strutz was responsible for his conduct and concluding that his suicide attempt had been manipulative. Following this major misconduct, Strutz was reclassified by MDOC as a "high" assaultive risk.

Because of his impending parole eligibility, Strutz was referred for a Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) assessment and a report was generated on August 2, 2013.[1] The COMPAS assessment categorized Strutz as having a "low" risk for violence and recidivism. Various scales were used in the report to assess Strutz in a number of pertinent areas. The report found it "unlikely" that Strutz would have a substance abuse problem. In this regard, the report noted that Strutz admitted to committing the murder for which he was imprisoned while he was "high/drunk" but also noted that he had not had any prior drug charges or convictions and that he "indicated no history of alcohol problems." With regard to Strutz's potential reintegration into society, the report indicated Strutz was "unlikely" to face

---

[1] Among the many resources available to the Parole Board, a COMPAS assessment is "a comprehensive risk and needs assessment system, which takes into account both static information (such as the prisoner's past criminal offenses) and dynamic data (such as the prisoner's evolving attitudes and mental condition."). *In re Parole of Elias*, 294 Mich App 507, 520; 811 NW2d 507 (2011). It is designed to "describe the offender's risk and criminogenic needs." *Id.* The Board is not required to consider a COMPAS assessment, but may do so. *Id.* at 512-513.

reentry social insolation based on his proposed, post-release support system. The report characterized Strutz as being "unlikely" to face reentry cognitive behavioral problems, noting that "[a] cognitive therapy program does not appear to be needed." In addition, the report indicated Strutz did not need vocational or educational treatment intervention, and that Strutz was "likely to return to a relatively low[-]risk living environment" and was "likely" to have a "stable lifestyle, residence, and adequate social ties," given his reported support system. With regard to mental health, the report indicated that Strutz did not indicate having any mental health history for depression or suicidal tendencies. The report made no mention of Strutz's recent suicide attempt, despite the fact that it was generated shortly after the attempt.

As would be used to later calculate his parole-eligibility guidelines, see Mich Admin Code, R 791.7716(3), Strutz, at some point during his incarceration, was assessed for property risk and assaultive risk. The screening sheets are made up of a flow-chart-type grid that takes into account a number of factors, including an inmate's criminal history and institutional record. The property risk screening sheet indicated a "low" property risk. Based on his underlying murder conviction and "Serious Institutional Misconduct," Strutz was classified as a "high" assault risk.

In accordance with MCL 791.233e, Strutz's parole-eligibility guidelines were calculated in November 2013. The guidelines consider a panoply of factors, including, among others, the offense for which the prisoner is sentenced, the circumstances of the underlying crime, prior criminal history, any aggravating or mitigating factors, security classifications, institutional behavior, age, and the property and assaultive risk factors noted above. Strutz's final parole guidelines score was + 4, which indicates a high probability of parole.

In December 2013, a member of the Board interviewed Strutz and prepared a Case Summary Report (CSR). As will be discussed in more detail below, the phrase "Not used as reason" was contained in parenthesis following several of the notations made in the CSR. Strutz's CSR noted that he had received misconduct tickets, including the ticket noted above for possessing the razor blade, while he was incarcerated, but also noted that he had "satisfactory block reports" during his incarceration. The CSR noted that Strutz had a history with alcohol use, but that he had completed substance abuse programs during his incarceration, as recently as August 2012. As it concerned Strutz's mental health, the CSR noted "Adjustment Disorder" and "Anti-Social Personality Disorder." The CSR noted the COMPAS assessment's indication that Strutz was classified as a "low" risk for violence and recidivism.

As to Strutz's plan for reintegration into society, the CSR remarked that Strutz showed "suitable arrangements for work" and that he had a proposed job lined up after his release. Strutz indicated that he would stay with his sister if released from prison.

In January 2014, Strutz underwent, at the behest of the Board, a Qualified Mental Health Professional Evaluation (QMHPE). The evaluation acknowledged that Strutz had a previous suicide attempt, but indicated that currently, Strutz "denied any thoughts or feelings of suicidal ideation." According to the QMHPE, Strutz's earlier suicide attempt was a "desperate attempt to cope with a situation he thought he could not handle." The QMHPE assessed Strutz's current suicide risk level as "low." As to substance abuse, the QMHPE revealed that Strutz indicated he had completed substance abuse treatment during his incarceration.

-3-

The author of the QMHPE report listed a "Clinical Assessment" of "Antisocial Personality Disorder" for Strutz. Yet, the author stated "I do not see any current personality traits or attitudes which would impact Mr. Strutz's functioning or future adjustment to the community. I also do not detect anything that would predispose him to continued criminal behavior if released." The evaluator noted that Strutz had accepted responsibility for his offenses and was remorseful.

In addition, with regard to Strutz's potential reentry into society, the author of the QMHPE concluded, "I can find nothing clinically that will make it difficult for Mr. Strutz to adjust back to the community if released at this point." This was based in part on the fact that Strutz had reported he had "a lot of family support to help him adjust back to society." This help included potential housing with Strutz's sister.

On February 13, 2014, the Board issued its decision to grant Strutz parole, with a projected release date of March 25, 2014. The Board concluded that "[r]easonable assurance exists that [Strutz] will not become a menace to society or to the public safety . . . ." The decision noted that Strutz had "satisfactory block reports" during his incarceration, was a high school graduate/GED recipient, completed vocational training, completed substance abuse programs and self-help programs, had suitable arrangements for work after his release, had acceptable proposed living arrangements, and that he had the support of family and/or the community.

The Macomb County Prosecutor appealed the Board's decision to the circuit court in March 2014. The circuit court reversed the grant of parole in a May 12, 2014 written opinion and order. The court's analysis began by concluding that the CSR and COMPAS assessment's indications that Strutz was categorized as a "low" risk for recidivism and violence were "clearly contrary to known and established facts." The court reasoned that the details of murder, Strutz's misconduct tickets, and his recent suicide attempt showed that he was at risk for violence and recidivism.

Next, the court took issue with the COMPAS assessment's conclusion indicating an "unlikely" reentry isolation score for Strutz. According to the court, "[t]hese claims are belied by the purported reason for his recent suicide attempt, his prior suicidal thoughts, [ ] his fixation on his ex-wife" and his diagnosis of Adjustment Disorder and Anti-Social Personality Disorder. Further, as to Strutz's mental health, the court criticized the COMPAS assessment for classifying Strutz as "unlikely" for suicidal thoughts and/or depression "despite the reasons for murdering the victim, his prior suicidal thoughts and his recent suicide attempt." According to the court, Strutz "has an evident lack of appropriate coping skills."

The court continued attacking the perceived accuracy of the COMPAS assessment with regard to its conclusions about Strutz's substance abuse. The court reasoned that any claim in the COMPAS assessment that Strutz was "unlikely" to suffer from substance abuse was contradicted by the fact that Strutz admitted to having consumed a significant volume of alcohol before committing the murder, and by the fact that he had previously admitted to having a substance abuse problem.

"Even more distressing" to the circuit court was the CSR's repeated indications that certain negative attributes were noted in the report as being "Not used as reason." According to the court, the phrase "Not used as reason" demonstrated that the Board declined to consider some of Strutz's negative attributes and "attempted to write off important evidence contrary to its decision." Lastly, the court noted Strutz's parole guidelines score—+4—and concluded that, although the score indicated a high probability of parole, the score did not "mandate" that Strutz be paroled.

The Board moved the circuit court for reconsideration and provided a written explanation of its decision to grant Strutz parole. The explanation listed a number of factors the Board considered and stated that the Board expressly considered the material that the circuit court found to be "contrary" to the COMPAS assessment. The Board explained that it considered the QMHPE and was aware of Strutz's recent suicide attempt, but relied on the QMHPE's conclusion that Strutz was not presently suicidal. The Board further stated that it considered all material noted in the CSR, including the matters labeled "Not used as reason," which entry was located next to both favorable and unfavorable information pertaining to Strutz. According to the Board's explanation, the "Not used as reason" notation was only visible when the CSR was printed out, and was not visible when viewed electronically. The Board classified this as a "software printout language glitch" of which Board members were aware.

The circuit court denied the Board's motion for reconsideration on July 18, 2014. In a written opinion and order, the circuit court first stated that it considered the Board's written explanation to be an "impermissible expansion of the record on appeal" and stated that it would be "disregarded." Next, the court reiterated its earlier conclusion that the COMPAS assessment was "contrary to the known facts." It also questioned the validity of the QMHPE, particularly with regard to the conclusion that Strutz did not have any present suicidal ideation. In this regard, the court noted that the QMHPE "consisted of a single interview of Strutz" and did not entail any psychological testing. The court's opinion concluded that Strutz's recent suicide attempt "establishes he continues to exhibit the same behaviors (violence and irrational thinking) that led to his imprisonment." This, reasoned the circuit court, made it "clear that Strutz has neither been rehabilitated nor evolved during his incarceration." Consequently, the court concluded that the Board "did not have reasonable assurance based on consideration of the actual facts and circumstances, including Strutz'[s] real mental and social attitudes, that he would not become a menace to society and/or the public safety." The court denied the motion for reconsideration.

This Court initially denied the Board's application for leave to appeal, *In re Parole of Steven J. Strutz*, unpublished order of the Court of Appeals, entered September 5, 2014 (Docket No. 323101), but our Supreme Court remanded the matter to this Court for consideration as on leave granted as to both Strutz and the Board, *In re Parole of Steven J. Strutz*, 497 Mich 980; 860 NW2d 633 (2015).

II. ANALYSIS

A. STANDARD OF REVIEW

This Court reviews the decision of the Board to grant parole for an abuse of discretion. *In re Parole of Elias*, 294 Mich App 507, 538; 811 NW2d 541 (2011). The prosecutor, as the party challenging the Board's grant of parole, "has the burden to show either that the Board's decision was a clear abuse of discretion or was in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation." *Id.* (citation and quotation marks omitted). The Board's decision represents an abuse of discretion when it is outside the range and reasonable and principled outcomes. *Id.* "[A] reviewing court may not substitute its judgment for that of the Board." *Id.* at 538-539.

## B. APPLICABLE LAW

"Although matters of parole lie solely within the broad discretion of the [Board], that discretion is clearly restricted by legislative limitations." *In re Parole of Haeger*, 294 Mich App 549, 556; 813 NW2d 313 (2011) (citations and quotation marks omitted; alteration in original). For instance, "[s]tatutorily mandated parole guidelines form the backbone of the parole-decision process." *Elias*, 294 Mich App at 511. The guidelines are designed to consider all relevant facts and circumstances, and "are an attempt to quantify the applicable factors that should be considered in a parole decision and are intended to inject more objectivity and uniformity into the process in order to minimize recidivism and decisions based on improper considerations such as race." *Id.* (citation and quotation marks omitted). "The guideline factors are separated into eight sections, each with a list of subfactors to be scored and instructions on the point value to be assigned." *Haeger*, 294 Mich App at 554.[2] "When scoring the parole guidelines, the Board must consider 'all relevant facts and circumstances, including the prisoner's probability of parole as determined by the parole guidelines . . . and any crime victim's statement . . . .' " *Elias*, 294 Mich App at 515, quoting Mich Admin Code, R 791.7715(1). "The aggregated score is 'used to fix a probability of parole determination for each individual on the basis of a guidelines score. Prisoners are categorized under the guidelines as having a high, average, or low probability of parole.' " *Haeger*, 294 Mich App at 554, quoting *Elias*, 294 Mich App at 518 (citation omitted). Here, Strutz's parole guidelines score was +4, which placed him in the category of a high-probability of parole. See *Elias*, 294 Mich App at 518 (a score of +3 or higher places a prisoner in the high-probability category). With a "high-probability" score, "the Board was required to grant parole absent substantial and compelling reasons to depart from that decision." *Elias*, 294 Mich App at 539.

---

[2] As described in more detail in *Elias*, 294 Mich App at 512-513, the Legislature, in MCL 791.233e(2) has set forth mandatory factors to be considered, including: (a) the offense for which the prisoner was incarcerated; (b) the prisoner's institutional program performance; (c) the prisoner's institutional conduct; (d) the prisoner's prior criminal record; and (e) other relevant factors as determined by the Department of Corrections. In addition, the Legislature has set forth permissive factors for consideration in MCL 791.233e(3), such as: (a) the prisoner's statistical risk screening—which includes assessments such as a COMPAS assessment; and (b) the prisoner's age.

In addition to the restrictions imposed on the Board's authority by the guidelines, the Legislature imposed the following constraints on the Board's authority:

> the Legislature forbade the Board from releasing a prisoner who has been incarcerated for two or more years unless that prisoner has earned a general education development certificate GED. MCL 791.233(1)(f). The Board may not grant parole unless it "has satisfactory evidence that arrangements have been made for . . . employment . . ., for the prisoner's education, or for the prisoner's care if the prisoner is mentally or physically ill or incapacitated." MCL 791.233(1)(e). Most importantly, "[a] prisoner shall not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety." MCL 791.233(1)(a). [*Elias*, 294 Mich App at 522.]

## C. THE PAROLE BOARD DID NOT ABUSE ITS DISCRETION[3]

In light of the pertinent factors, we hold that the prosecution did not meets its burden of establishing that the Board clearly abused its discretion when it granted parole to Strutz, and the circuit court impermissibly substituted its judgment for that of the Board. See *Elias*, 294 Mich App at 538-539. As an initial matter, we note that Strutz's guidelines score was +4, which required the Board to grant parole absent substantial and compelling reasons to deny parole. MCL 791.233e(6); *Elias*, 294 Mich App at 539. The Board did not articulate any substantial and compelling reasons that would enable it to deny parole in spite of Strutz's guidelines score, and such reasons do not appear to exist in the record. The circuit's court's decision lacks an acknowledgment of the effect of Strutz's high-probability score, other than stating that a high-probability score "does not *mandate* that he actually be paroled." While the court was correct that parole was not unequivocally mandated, the court gave no consideration to the fact that Strutz's score nevertheless required the Board to grant parole, absent substantial and compelling reasons. *Elias*, 294 Mich App at 539. The circuit court did not articulate any substantial and compelling reasons; rather, as will be discussed, the circuit court simply identified conflicting information and concluded that the Board abused its discretion. This was improper.

---

[3] Strutz argues that the issues raised before this Court were not properly preserved by the prosecution in the administrative agency proceedings. We do not interpret MCR 7.118 to preclude the prosecution from raising before the circuit court arguments that were not raised before the Board at the parole hearing. Further, a party generally need not take exception to a decision-makers' factual findings or ultimate decision. MCR 2.517(A)(7). Finally, even if these issues are not preserved, we exercise our discretion to nevertheless address them as necessary for the proper determination of the case and as questions of law for which the facts necessary for the resolution have been presented. See *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006).

Turning back to the decision of the Board, nothing in the record gives rise to any allegation that the Board failed to follow statutory or regulatory procedures in evaluating Strutz for parole. Rather, the record supports that the Board followed the requisite procedures and regulations in evaluating Strutz's parole eligibility. For instance, Strutz underwent an interview with a Board member and the resulting CSR noted Strutz's institutional record and all of his misconduct tickets—including the ticket for possessing a razor blade—but noted that he had "satisfactory block reports" during his incarceration. The CSR also noted that, despite Strutz's past alcohol use, he had completed substance abuse assessments while incarcerated. The CSR also concluded that Strutz had suitable placement upon his release, as well as suitable arrangements for employment. In addition, the CSR noted the COMPAS assessment's conclusion that Strutz posed a "low" risk for violence and recidivism.

The circuit court was highly critical of the CSR, particularly because the phrase "Not used as reason" appeared several times in the report. On reconsideration, the circuit court refused to consider the Board's written explanation, which accounted for the use of the phrase. By refusing to consider the Board's written explanation—instead assuming that the Board intentionally disregarded record evidence—the circuit court erred. Pursuant to MCR 7.114(D), a motion for reconsideration of a circuit court's appellate decision is governed by MCR 2.119(F), not the subsections of MCR 7.118(H) cited by the circuit court. Under MCR 2.119(F), a trial court ordinarily "has discretion on a motion for reconsideration to decline to consider new legal theories or evidence that could have been presented when the motion was initially decided." *Yoost v Caspari*, 295 Mich App 209, 220; 813 NW2d 783 (2012) (citations omitted). However, to meaningfully review a parole decision, it is vital that the circuit court understand what evidence the Board considered. See MCR 7.118(H)(1)(a) ("The record on appeal shall consist of the prisoner's central office file at the [DOC] and *any other documents considered by the parole board* in reaching its decision.") (emphasis added); *Elias*, 294 Mich App at 522-523 (explaining that the Board is required to provide a written explanation of its parole decision that is sufficient to permit meaningful appellate review). The reviewing court must not merely assume that the Board ignored record evidence. *Elias*, 294 Mich App at 547.[4]

Moreover, even ignoring the Board's written explanation, we disagree with the circuit court's assessment that the Board's use of the phrase "Not used as reason"—which appears at the end of 14 paragraphs in the Case Summary Report—was evidence that the Board intentionally disregarded negative information about Strutz. Although "(Not used as reason)" follows paragraphs containing negative information about Strutz, it also follows paragraphs containing positive information about him. For example, the "(Not used as reason)" notation follows paragraphs indicating that Strutz was honorably discharged after serving in the Marine Corps, had no criminal record prior to the offenses for which he was imprisoned, had a low risk for violence and recidivism, per the COMPAS assessment, had completed substance abuse programs

---

[4] Instead, if the circuit court, "after surveying the explanation given and relevant record, cannot discern . . . the basis of the parole board's decision," the court can enter an order of remand for the Board to explain its decision. *Glover v Parole Bd*, 460 Mich 511, 525-526 n 22; 596 NW2d 598 (1999).

in prison, had arranged for employment after parole, and had a sister willing to house him and offer him financial support. Thus, the circuit court's criticism—that the Board intentionally ignored information that was contrary to its decision—is not supported by the entirety of the CSR.

In addition, we find nothing amiss about the Board's reliance on, or procedures employed in conducting, the COMPAS assessment prepared in this case. The COMPAS assessment supported the Board's decision. As noted, a COMPAS assessment is one of the statistical risk assessments upon which the Board may rely. The COMPAS assessment indicated that Strutz had a "low" risk for violence and recidivism, that he was "unlikely" to have a substance abuse problem, and that he was "unlikely" to encounter social integration problems or behavioral problems upon reentry into society. The assessment noted that Strutz would have a positive support system after his release, would have adequate housing, and that he did not need vocational or educational training.

The circuit court was highly critical of the COMPAS assessment, doubting its conclusions based on certain contradictory information, such as the heinous nature of Strutz's sentencing offense, past substance abuse, recent suicide attempt, and the court's description of Strutz's "fixation" on his ex-wife.[5] However, in doing so, the circuit court: (a) came to its own conclusions about Strutz, based on the presence of conflicting information; and (b) relied too heavily on static information, such as Strutz's past substance abuse and the sentencing offense. As to conflicting information, "this Court has repeatedly determined that there is no abuse of discretion when a court or a fact-finder is faced with conflicting information and makes a reasonable and principled decision regarding which side to believe." *Elias*, 294 Mich App at 546. See also *Haeger*, 294 Mich App at 578-579 (holding that the Board's decision to resolve conflicting evidence does not amount to an abuse of discretion). Here, the Board had before it, at worst, conflicting information about Strutz's capacity for violence and recidivism, and found that, in spite of this conflicting evidence, Strutz's risk for violence and recidivism was low. This was not an abuse of discretion. Indeed, the CSR reached the same conclusion about the risk Strutz posed, and the QMHPE concluded, after evaluating Strutz and considering his suicide attempt, that he was a "low" risk for suicide. The QMHPE evaluator also noted the absence of "anything that would predispose [Strutz] to continued criminal behavior if released." Although the circuit court was understandably concerned with Strutz's suicide attempt, the QMHPE, which was authored after Strutz's suicide attempt, concluded that Strutz was a low suicide risk. It is the Board's role to weigh this conflicting information.

Furthermore, the circuit court's criticisms of the COMPAS assessment were narrowly—and unfairly—focused on static information, such as the nature of the offense and Strutz's past alcohol abuse. In *Elias*, 294 Mich App at 544-545, this Court cautioned against reliance on static factors, such as the nature of the offense, and cautioned against ignoring dynamic, or changing factors. Indeed, while the Board is to consider the prisoner's past offenses, it "must also look to

---

[5] Strutz's "fixation" on his ex-wife does not appear as a current concern in any assessments, interviews, or evaluations performed on Strutz as part of the parole process.

the prisoner's rehabilitation and *evolution throughout his or her incarceration*." *Id.* at 544 (emphasis added). Here, while it is undisputed that Strutz had past struggles with alcohol abuse, all of the evidence before the Board indicated that he was a low risk for substance abuse in the future, and that he had completed substance abuse programs during his incarceration. The circuit court ignored this information, and Strutz's past substance abuse issues do not form the basis for finding an abuse of discretion on the part of the Board.

As to the heinous nature of Strutz's offense, that has never been, nor ever will be, in doubt. However, as did the Court in *Elias*, we note that the nature of the offense was taken into account in the scoring of Strutz's parole guidelines. See *Elias*, 294 Mich App at 545. In addition, the offense was already taken into account when his sentencing guidelines were calculated, and the nature of the offense contributed to the minimum sentence in this case. See *id.* at 545-546. By the time the Board considered him for parole, Strutz had already completed serving his minimum sentence, which is what brought him before the Board in the first instance. See *id.*, citing MCL 791.233(1)(b) and MCL 791.234(1). The circuit court's written opinion and order was clearly focused on the heinous nature of the offense, stating that "[t]he severity of this crime can not [sic] be overstated." Again, while we agree that Strutz's sentencing offense was reprehensible, the circuit court's repeated references to the offense, including referencing the offense as support for its reasons that the COMPAS was incorrect and that Strutz had not changed during his incarceration, despite evidence suggesting that Strutz had made changes and was a low risk for recidivism and violence, was erroneous. See *id.*

Lastly, with regard to the COMPAS assessment, the circuit court doubted the efficacy of the assessment because it failed to take into account Strutz's recent suicide attempt. However, the suicide attempt was documented in other material that the Board considered. The Board's written explanation expressly acknowledged this shortcoming in the COMPAS assessment, but it also indicated that the Board was well aware of Strutz's suicide attempt when deciding whether to grant him parole. The Board—per the written explanation of its decision—relied on the QMHPE, which it was entitled to do, in making its decision. Given the information in the QMHPE, which found that Strutz was not presently suicidal, we cannot conclude that the Board abused its discretion in resolving this conflicting information. See *Haeger*, 294 Mich App at 579.

Turning in more detail to the QMHPE, we note that the January 2014 QMHPE also supports the Board's decision to grant parole in this case. The QMHPE expressly found that Strutz's current suicide risk was low and that he denied any thoughts or feelings of suicidal ideation. The QMHPE acknowledged Strutz's Antisocial Personality Disorder, but nevertheless concluded that the disorder—or any other personality traits—would not prevent him from adjusting to life outside of prison, and that he did not have any traits suggesting that he would be predisposed to continued criminal behavior. The report was positive in regard to Strutz's ability to function outside of prison, noting the strong family support and potential housing with his sister.

In this regard, we disagree with the circuit court's criticisms—levied in the written opinion and order denying reconsideration—of the QMHPE. The court criticized the report's finding that Strutz lacked present suicidal ideation because it was based only on a "single interview" of Strutz. The circuit court faulted the QMHPE for not conducting any psychological

testing of Strutz before determining that he had developed adequate coping skills. However, the circuit court pointed to no statutory or regulatory authority for the conclusion that psychological testing was necessary in this particular case, nor does any exist. See Mich Admin Code, R 791.7715(5) (requiring a psychological or psychiatric evaluation under certain circumstances not present in this case); *Haeger*, 294 Mich App at 577 (same). Furthermore, this Court has repeatedly stated that evaluating a prisoner's mental and social attitude involves a subjective determination on the part of the Board, for which the guidelines cannot account. See, e.g., *Elias*, 294 Mich App at 543. Here, the QMHPE provided support for the Board's conclusions, and does not represent an abuse of discretion on the part of the Board. The circuit court's own conclusions about Strutz's mental health represent another instance of the court improperly substituting its judgment for that of the Board. See *id.* at 547-548 ("The circuit court substituted its judgment regarding the record evidence for that of the legislatively designated executive agency.").

Finally, as further support for the conclusion that the Board did not abuse its discretion, we note the repeated instances in the record detailing Strutz's family support, post-release living accommodations, and post-release prospects of employment. These were positive attributes listed in the COMPAS assessment that were never disputed or contradicted. Such factors were appropriate for the Board to consider in determining Strutz's readiness for release. See Mich Admin Code, R 791.7715(2)(c). The record also demonstrates that Strutz accepted responsibility for his past behavior, which is a factor appropriately considered by the Board in evaluating his personal history and growth. See Mich Admin Code, R 791.7715(2)(d).

In sum, nothing in the record indicates that the Board abused its discretion. Although there certainly was cause for concern in this case given some of Strutz's actions, the Board acted in accordance with all pertinent statutes and regulations. In addition, the Board appropriately weighed conflicting information, as it is charged with doing. Because of this, and because of the Board's role in the parole process, we find no abuse of discretion by the Board and conclude that the circuit court invaded the province of the Board and substituted its judgment for that of the Board. Accordingly, we reverse the decision of the circuit court and remand for reinstatement of the order granting parole to Strutz.

Of note, two years have passed since the Board made its decision. As indicated in the Parole Board Notice of Decision, "Misconduct, security reclassification or other adverse information may result in suspension of this parole action." As such, the Board remains free to take into account Strutz's conduct over the past two years when deciding whether to follow-through on its grant of parole.

Reversed and remanded for reinstatement of the order granting parole. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

-11-