*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Parole of ROBERT ERWIN STUMPMIER.

MONROE COUNTY PROSECUTOR,

UNPUBLISHED
July 25, 2019

Appellee,

v

No. 343502
Monroe Circuit Court
LC No. 17-140487-AP

ROBERT ERWIN STUMPMIER,

Appellant,

and

PAROLE BOARD,

Intervenor.

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Appellant, Robert Erwin Stumpmier, appeals as on leave granted[1] the trial court's order reversing a decision by the Michigan Parole Board (the Board) granting appellant parole. We reverse and remand for reinstatement of the Board's order granting parole.

---

[1] Stumpmier's emergency application for leave to appeal was originally denied by this Court; however, appellant appealed to the Michigan Supreme Court, and in lieu of granting leave, the Supreme Court remanded the case to this Court for consideration as on leave granted. *In re Parole of Stumpmier*, unpublished order of the Court of Appeals, entered June 27, 2018 (Docket No. 343502); *In re Parole of Stumpmier*, 503 Mich 941 (2019) (Docket No. 343502).

## I. BACKGROUND

On June 9, 2015, a jury found Stumpmier guilty of six counts of using a computer to commit a crime, MCL 750.797(3)(d), and six counts of possession of child sexually abusive material, MCL 750.145(c)(4). The facts leading to these convictions are as follows. In June 2014, Monroe police seized Stumpmier's computer and cell phone. The computer and cell phone were sent to the Internet Crimes Against Children Task Force (ICAC), and 131 images of suspected child pornography were found. These images were submitted to Dr. Randall Schlievert at Child Advocacy Center in Toledo, Ohio to render his medical opinion regarding the ages of the individuals depicted in the images. Dr. Schlievert based his opinion on developmental and growth factors. He found six images that appeared to depict children under the age of 18 years old. In addition, more pictures were extracted from Stumpmier's thumb drive. Of those images, Dr. Schlievert was given 29 of naked teen males that appeared to depict individuals between the ages of 16 and 19 years old. He concluded that five of the images depicted individuals under the age of 18. The ICAC report also stated that the computers from which these images were exported were owned and operated by Stumpmier and then transferred to another computer's hard drive. Officers found that Stumpmier possessed and distributed child pornographic images that depicted teenage boys in sexual poses, exposing their genitalia, or performing various sexual acts. On July 30, 2015, the trial court sentenced Stumpmier to concurrently serve six terms of 365 days' imprisonment for the six counts of possession of child sexually abusive material, and six terms of 18 to 84 months' imprisonment for the six counts of using a computer to commit a crime. Sex-offender treatment was also recommended as part of appellant's sentences for the six counts of using a computer to commit a crime.

Also, on August 21, 2015, Stumpmier pleaded no contest to two counts of attempted accosting a child for immoral purposes in violation of MCL 750.145a. The events that led to these two counts involved two teenage boys, NN and WK. During February 2014, WK and NN both reported to the police that while members of the group, the Monroe Music Makers, for which Stumpmier served as the group's leader, Stumpmier took WK "under his wing," and from the time he was 14 years old on multiple occasions Stumpmier took pictures of WK's penis or encouraged WK to engage in sexual activity with NN, or another man who was 19 years old at the time. NN also reported that Stumpmier manipulated and pressured NN and WK to engage in a sexual relationship. Stumpmier became obsessed with WK performing oral sex on NN. WK confirmed that Stumpmier tried to coax a relationship and oral sex between the two of them on several occasions. On one occasion, when Stumpmier took WK and NN to Nashville, Tennessee, he supplied WK and NN alcohol and encouraged them to engage in sexual activity with each other. On October 8, 2015, the trial court sentenced Stumpmier to two concurrent terms of 16 to 24 months' imprisonment for the two counts of attempted accosting a child for immoral purposes. In its judgment of sentence, the trial court ordered Stumpmier to undergo sex-offender treatment.

On August 31, 2016, the Board granted parole to Stumpmier. The prosecution appealed this decision. The trial court reversed the Board's decision on February 14, 2017, concluding that the Board had failed to consider a Transitional Accountability Plan (TAP) before granting parole. A TAP, however, had been prepared on October 11, 2016.

On September 18, 2017, the Board again granted Stumpmier parole. The prosecution again appealed. The prosecution did not argue that Stumpmier had any requirement to complete sex-offender treatment before being granted parole; rather, the prosecution argues that, because Stumpmier did not complete sex-offender treatment before being granted parole, the Board lacked reasonable assurance that he would not be a menace to society. The trial court agreed with the prosecution and reversed the Board's decision. The trial court concluded that, despite Stumpmier's convictions of seven offenses of a sexual nature all of which involved underage children and his Qualified Mental Health Professional Evaluation (QMHP) which identified Stumpmier's deviant sexual preference as a concern, the Michigan Department of Corrections (MDOC) nonetheless waived sex-offender treatment for Stumpmier. The trial court also noted that, even though the MDOC prepared Stumpmier for employment, the MDOC made no effort to address his sexual deviance. The trial court concluded that, considering the facts of this case, the Board did not have reasonable assurance that Stumpmier would not become a menace to society or public safety in the absence of sex-offender treatment. Stumpmier argues in this appeal that the trial court erred by reversing the Board's decision to grant him parole.

## II. STANDARD OF REVIEW

When reviewing a circuit court's reversal of the Parole Board's decision to grant parole, this Court must determine whether the Board abused its discretion. See *In re Parole of Haeger*, 294 Mich App 549, 571; 813 NW2d 313 (2011); *In re Parole of Elias*, 294 Mich App 507, 538; 811 NW2d 541 (2011); *Killebrew v. Dep't of Corrections*, 237 Mich App 650, 652; 604 NW2d 696 (1999). The challenging party bears the burden of proving that the Board's decision was either a " 'clear abuse of discretion' or was 'in violation of the Michigan Constitution, a statute, an administrative rule, or a written agency regulation.' " *Elias*, 294 Mich App at 538 (citation omitted); see MCR 7.118(H)(3). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "[A] reviewing court may not substitute its judgment for that of the Board." *Elias*, 294 Mich App at 538-539.

## III. ANALYSIS

Stumpmier argues that the trial court erred when it reversed the Board's decision to grant him parole because he was not required to complete sex-offender treatment before being released on parole and the Board thoroughly considered all relevant facts and circumstances and properly found that Stumpmier met the conditions of parole. We agree.

MCL 791.233 provides in relevant part:

(1) The grant of a parole is subject to all of the following conditions:

(a) A prisoner must not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety.

(b) [A] parole must not be granted to a prisoner other than a prisoner subject to disciplinary time until the prisoner has served the minimum term

-3-

imposed by the court less allowances for good time or special good time to which the prisoner may be entitled by statute, except that a prisoner other than a prisoner subject to disciplinary time is eligible for parole before the expiration of his or her minimum term of imprisonment whenever the sentencing judge, or the judge's successor in office, gives written approval of the parole of the prisoner before the expiration of the minimum term of imprisonment.

\* \* \*

(d) [A] parole must not be granted to a prisoner subject to disciplinary time until the prisoner has served the minimum term imposed by the court.

(e) A prisoner must not be released on parole until the parole board has satisfactory evidence that arrangements have been made for such honorable and useful employment as the prisoner is capable of performing, for the prisoner's education, or for the prisoner's care if the prisoner is mentally or physically ill or incapacitated.

\* \* \*

(3) The parole board may promulgate rules under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, that are not inconsistent with this act with respect to conditions imposed upon prisoners paroled under this act.

MCL 791.233e authorizes the MDOC to develop parole guidelines consistent with MCL 791.233(1)(a) "to govern the Board's exercise of its discretion" regarding "the release of prisoners on parole" and to assist it "in making objective, evidence-based release decisions that enhance the public safety." MCL 791.233e(1). "Pursuant to this legislative mandate, the [MDOC] promulgated regulations outlining certain factors for the Board to consider when making a parole decision[.]" *In re Parole of Haeger*, 294 Mich App 549, 553; 813 NW2d 313 (2011). In *Haeger*, this Court explained:

The Board must determine "whether parole is in the best interests of society and public safety" considering the prisoner's past and current criminal behavior, "[i]nstitutional adjustment," "[r]eadiness for release," "personal history and growth," and "physical and mental health." Mich. Admin Code, R 791.7715(2). Moreover, when a prisoner has a history of "predatory or assaultive sexual offenses," the prisoner must undergo a "psychological or psychiatric evaluation before the release decision is made. . . ." Mich. Admin Code, R 791.7715(5).

The DOC regulations further direct the Board to consider "all relevant facts and circumstances, including the prisoner's probability of parole as determined by the parole guidelines. . . ." Mich. Admin Code, R 791.7715(1). The guidelines, in turn, require that scoring be based on the prisoner's time served as well as the "aggravating and mitigating circumstances" of the sentencing offense, the "prisoner's prior criminal record," the number of major misconducts committed by the prisoner within the preceding one- and five-year periods, the

prisoner's score on "risk screening scales," the prisoner's age, the prisoner's performance in recommended institutional programs, and "[t]he prisoner's mental health" status. Mich. Admin Code, R 791.7716(3). [*Haeger*, 294 Mich App at 553-554 (footnote omitted).]

In *In re Parole of Spears*, 325 Mich App 54, 60; 922 NW2d 688 (2018), this Court recently explained:

> Generally, matters of parole lie solely within the broad discretion of the Board. The Board should consider a prisoner's sentencing offense when determining whether to grant parole to a prisoner, but the Board must also look to the prisoner's rehabilitation and evolution throughout his or her incarceration. However, the Legislature has clearly imposed certain statutory restrictions on the Board's exercise of its discretion. Statutorily mandated parole guidelines form the backbone of the parole-decision process.

> Caselaw derived from statutory authority holds that the Board may not grant parole unless it has satisfactory evidence that arrangements have been made for employment, for the prisoner's education, or for the prisoner's care if the prisoner is mentally or physically ill or incapacitated. Further, a prisoner shall not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety. [Quotation marks, alterations, and citations omitted.]

The parole guideline factors are scored, and after they are scored, the "score is then used to fix a probability of parole determination for each individual on the basis of a guidelines schedule. Prisoners are categorized under the guidelines as having a high, average, or low probability of parole." *Elias*, 294 Mich App at 518. Pursuant to MCL 791.233e(6), once a prisoner has been given a high probability of parole as determined by the guidelines, the Board is required to grant parole "absent substantial and compelling reasons to depart from that decision." *Elias*, 294 Mich App at 539.

In this case, Stumpmier received a final parole guidelines score of five points which indicated that he had a high probability of parole. Therefore, the Board was required to grant Stumpmier parole unless a substantial and compelling reason existed to depart from the parole guidelines.[2] The record reflects that, in deciding to grant Stumpmier parole, the Board

---

[2] The Legislature amended MCL 791.233e on December 12, 2018. MCL 791.233e(7) was added and it sets forth specific circumstances that constitute a "substantial and compelling objective" reason to depart from the parole guidelines for a prisoner with high probability of parole. MCL 791.233e(7) states that a decision to depart from the parole guidelines should be limited to the circumstances set forth in MCL 791.233e(7)(a)-(k); however, MCL 791.233e(7) was not in effect when the circuit court reversed the Board's decision in this case, and therefore, it has not been applied in this case.

considered that he had not received sex-offender treatment but concluded that, even without prerelease sex-offender treatment, Stumpmier was not likely to engage in a sex offense. The Board considered Stumpmier's completion of Sexaholics Anonymous while incarcerated despite not having been admitted to or completed a sex-offender program because the MDOC waived this requirement as a result of his sex-offender risk assessments. During the QMHP evaluation, two risk assessments were used to determine Stumpmier's risk of sexual offending recidivism: the STATIC-99R and the STABLE 2007. The STATIC-99R is an "assessment tool designed to support the prediction of sexual offending recidivism in Adult Sex Offenders." Assessment under the STATIC-99R placed Stumpmier within the "Moderate-Low" risk category.

The STABLE 2007 assesses "change in intermediate-term risk status, assessment needs, and help predict recidivism in sexual offenders" by estimating "stable dynamic risk based upon the number of stable dynamic risk factors present in any one individual." The STABLE 2007 involves the assessment of the following 13 risk factors: 1) significant social influences, 2) capacity for relationship stability, 3) emotional identification with children, 4) hospitality toward women, 5) general social loneliness, 6) lack of concern for others, 7) impulsive acts, 8) poor cognitive problems, 9) negative emotionality and or hospitality, 10) sex drive or sexual preoccupation, 11) sex as coping, 12) deviant sexual interests, and 13) treatment and supervision cooperation. The factors are scored as follows: if a clinically significant concern factor is present, a score of two is assessed in the area; if some concern exists in the area evaluated, a score of one is assessed; and if no concern is apparent in the area evaluated, a score of zero is assessed.

Stumpmier's assessment resulted in one clinically significant area of concern regarding his capacity for relationship stability. His assessment concluded that some concern existed regarding his deviant sexual interests. No other areas resulted in concern assessments. Regarding his deviant sexual interests, the QMHP evaluation indicated that Stumpmier's victims were teenage males and his pornography preference indicated that Stumpmier had an interest in teenage males. Although Stumpmier denied any attraction to children at the time of his evaluation, he admitted that he previously looked up young people on the Internet because he preferred their youthful appearance.

The QMHP evaluation states that, although appellant had not received sex-offender treatment, he attended Sexaholics Anonymous where he learned that his triggers were "boredom or seeing sex on TV then going to his computer." Stumpmier reported that he planned to stay away from his computer or use it only for work. Stumpmier's overall STABLE 2007 risk assessment indicated that he was "considered to be low of stable dynamic needs," and had a low risk of recidivism. The QMHP evaluation also indicated that, on the basis of the results of the STATIC-99R and the STABLE 2007, the MDOC placed Stumpmier in a low priority category for supervision and intervention compared to other sex offenders using the same measurements.

Based on Stumpmier's STATIC-99R and the STABLE 2007 assessments, the MDOC waived the requirement that Stumpmier receive sex-offender treatment. Moreover, based on the results of these assessments, the Board concluded that no reason existed to override the MDOC's waiver to require that Stumpmier receive prerelease sex-offender treatment. The Board made its decision to grant Stumpmier parole because of his low risk and moderate low risk assessments, and the unlikelihood that he would engage in a sex offense even without sex-offender treatment.

The Board, however, required that, as a term of his parole, Stumpmier attend a sex-offender treatment program or other therapy as chosen by his field agent.

Further, the terms of Stumpmier's parole prohibited him from: 1) owning, possessing, or using a computer that connected to the Internet without first obtaining permission from his field agent; 2) verbal, written, electronic, or physical contact with any individual under age 17 or attempts to do so without the adult who is responsible for the underage individual first obtaining written permission from Stumpmier's field agent; 3) possessing sexually stimulating materials of any kind; 4) residing, working, or loitering within a student safety zone; and 5) any contact with the victims, NN and WK. Further, the terms of his parole required Stumpmier to attend substance abuse or residential reentry treatment and submit to Global Positioning System (GPS) monitoring.

The record also reflects that the Board considered Stumpmier's satisfactory block reports, the fact that he had no misconduct while incarcerated, and that he recognized the value of good behavior and had shown that he had the ability to follow rules and refrain from negative conduct. The record reflects that Stumpmier accepted responsibility for his crimes and expressed remorse for his conduct toward his victims. He acknowledged that he abused their trust.

The record also reflects that the Board considered Stumpmier's efforts to advance his education and employment opportunities while incarcerated and noted that he had realistic job prospects and community support. The record indicates that, while incarcerated, Stumpmier worked in the optical lab, passed the National Opticianry Competency Examination, and he became a certified optician. He also received an "above average" score for his work performance in the optical lab. Stumpmier completed a career and technical education program with a focus on food service and hospitality management, as well as a career and technical counseling program. The Board noted that his work assignment evaluations were excellent. Stumpmier also completed the Thinking for Change program in which his overall level of intellectual conceptualization was ranked as "excellent" in all areas. Stumpmier also completed self-help programs on his own initiative, such as Chance for Life—Substance Abuse Awareness, Chance for Life—Becoming a Person of Influence, Chance for Life—Communications and Critical Thinking, and "Workkeys." The Board noted that all of the self-help programs that Stumpmier attended would assist him in transitioning back into society. Stumpmier's central file also contained eight letters to the Board from members in the community, including family, friends, and a previous supervisor that supported paroling Stumpmier and asserted that they were prepared to assist him to achieve success.

Based on a review of the record before us, we conclude that the trial court abused its discretion by reversing the Board's parole decision. The evidence relied on by the Board justified the Board's decision. The Board had discretion to grant Stumpmier parole, and the Board could only deny him parole if it determined that a substantial and compelling reason existed to deny parole. The record does not reflect that a substantial and compelling reason existed for the Board to depart from the parole guidelines or to deny Stumpmier parole. Further, the record reflects that the Board placed multiple conditions on his parole, geared to ensure that Stumpmier would no longer be a menace to society or public safety. The prosecution failed to meet its burden to establish either that the Board's decision was a clear abuse of discretion or was in violation of the Michigan Constitution, a statute, an administrative rule, or a written

agency regulation. Therefore, the trial court improperly substituted its judgment for that of the Board and erred in reversing the Board's grant of parole.

Reversed and remanded for reinstatement of the Board's order granting Stumpmier parole. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford